Slip Op. 17-4

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **AN GIANG FISHERIES IMPORT AND EXPORT JOINT STOCK COMPANY ET AL.,** | |
| **Plaintiffs and Consolidated Plaintiffs,** | |
| **and** | |
| **ANVIFISH JOINT STOCK COMPANY ET AL.,** | |
| **Plaintiff-Intervenors and Consolidated Plaintiff-Intervenors,** | **Before: Claire R. Kelly, Judge** |
| **v.** | **Consol. Court No. 15-00044** |
| **UNITED STATES,** | **PUBLIC VERSION** |
| **Defendant,** | |
| **and** | |
| **CATFISH FARMERS OF AMERICA ET AL.,** | |
| **Defendant-Intervenors and Consolidated Defendant-Intervenors.** | |

<u>**OPINION AND ORDER**</u>

[Sustaining in part and remanding in part the U.S. Department of Commerce's final determination in the tenth antidumping duty administrative review of certain frozen fish fillets from the Socialist Republic of Vietnam.]

Dated: January 23, 2017

<u>Matthew Jon McConkey</u>, Mayer Brown LLP, of Washington, DC, argued for plaintiffs An Giang Fisheries Import and Export Joint Stock Company et al.

<u>Ned Herman Marshak</u> and <u>Andrew Thomas Schutz</u>, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY and Washington, DC, argued for consolidated plaintiffs, plaintiff-intervenors and consolidated plaintiff-intervenors Anvifish

Joint Stock Company et al. and Can Tho Import-Export Joint Stock Company.  With them on the briefs were <u>Andrew Brehm Schroth</u> and <u>Dharmendra Narain Choudhary</u>.

<u>Kara Marie Westercamp</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With her on the brief were <u>Ryan Michael Majerus</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, <u>Benjamin C. Mizer</u>, Principal Deputy Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Franklin E. White, Jr.</u>, Assistant Director.  Of Counsel on the brief were <u>Nanda Srikantaiah</u> and <u>Mercedes C. Morno</u>, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Nazakhtar Nikakhtar</u> and <u>Jonathan Mario Zielinski</u>, Cassidy Levy Kent (USA) LLP, of Washington, DC, argued for defendant-intervenors and consolidated defendant-intervenors Catfish Farmers of America et al.

Kelly, Judge:  This consolidated action is before the court on USCIT Rule 56.2 motions for judgment on the agency record challenging various aspects of the U.S. Department of Commerce's ("Department" or "Commerce") final determination in the tenth administrative review of the antidumping duty order covering certain frozen fish fillets from the Socialist Republic of Vietnam ("Vietnam").  <u>See</u> <u>Certain Frozen Fish Fillets From the Socialist Republic of Vietnam</u>, 80 Fed. Reg. 2,394 (Dep't Commerce Jan. 16, 2015) (final results of antidumping duty administrative review; 2012–2013) ("<u>Final Results</u>"), and accompanying Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Issues and Decision Memorandum for the Final Results of the Tenth Antidumping Duty Administrative Review; 2012–2013, Apr. 6, 2015, ECF No. 20 ("Final Decision Memo"); <u>see also</u> <u>Certain Frozen Fish Fillets from the Socialist Republic of Vietnam</u>, 68 Fed. Reg. 47,909 (Dep't Commerce Aug. 12, 2003) (notice of antidumping duty order).

Plaintiffs An Giang Fisheries Import and Export Joint Stock Company, Asia Commerce Fisheries Joint Stock Company, Cuu Long Fish Joint Stock Company, Hiep Thanh Seafood Joint Stock Company, International Development and Investment Corporation, NTSF Seafoods Joint Stock Company, Thuan An Production Trading and Services Co., Ltd., and Vinh Quang Fisheries Joint Stock Company (collectively "Agifish") commenced this action pursuant to section 516A of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a (2012).[1]  See Summons, Feb. 13, 2015, ECF No. 1.  The court consolidated Agifish's case with actions filed by: (1) Anvifish Joint Stock Company, Asia Commerce Fisheries Joint Stock Company, Cadovimex II Seafood Import-Export and Processing Joint Stock Company, Dai Thanh Seafoods Company Limited, Fatifish Company Limited, Hoang Long Seafood Processing Company Limited, Nam Viet Corporation, East Sea Seafoods Limited Liability Company, QVD Food Company Ltd., Saigon-Mekong Fishery Co., Ltd., and Can Tho Import-Export Joint Stock Company (collectively "Anvifish"); and (2) Can Tho Import-Export Joint Stock Company ("CASEAMEX").  See Scheduling Order and Order on Consolidation, May 6, 2015, ECF No. 29.

Agifish and Anvifish challenge Commerce's selection of Indonesia as the primary surrogate country to obtain surrogate values ("SV") for respondents' factors of production ("FOP") in this administrative review.  Mem. Law Supp. Pls.' Rule 56.2 Mot. J. Upon Agency R. 8–11, Oct. 2, 2015, ECF No. 46 ("Agifish Br."); Mem. Law Supp. Pl.'s Rule

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

56.2 Mot. J. Upon Agency R. 8–40, Oct. 2, 2015, ECF No. 47 ("Anvifish Br."). Agifish
challenges Commerce's selection of SV data sources to value various FOPs used to
produce the subject merchandise, including medicines and antibiotics, nutrition, fish feed,
packing tape, and packing strap, various fish waste byproducts, truck freight, and
brokerage and handling. Agifish Br. 11–16; 25–50, 52–55. In addition, Agifish challenges
Commerce's use of a conversion ratio to obtain size-specific values for respondent's
fingerlings as well as Commerce's rejection of fingerling length data submitted on the
record as untimely new factual information. Agifish Br. 16–25; 50–52. CASEAMEX
challenges Commerce's determination that it is not entitled to a separate rate. See Mem.
Law Supp. Consolidated Plaintiff CASEAMEX's Rule 56.1 Mot. J. Agency R. 11–41, Oct.
2, 2015, ECF No. 44 ("CASEAMEX Br."). Finally, Anvifish argues that, if Commerce
revises HVG's rate as a result of any of the challenges raised in this action, Commerce
must revise the dumping margin assigned to the separate rate respondents. Anvifish Br.
38–40.

The court sustains Commerce's selection of Indonesia as the primary surrogate
country in this review. The court also sustains Commerce's SV data selections for
medicines and antibiotics, nutrition, packing tape, packing strap, various fish waste
byproducts, truck freight, brokerage and handling, and the SV for fingerlings. However,
the court remands Commerce's SV data selection for fish feed. Since Anvifish's claim
that Commerce must revise the dumping margin assigned to the separate rate
respondents depends on whether Commerce's SV data selection for fish feed is revised,
the court defers consideration on this issue. The court remands Commerce's decision

not to grant CASEAMEX's separate rate status in this administrative review for further

consideration and explanation.

## BACKGROUND

Commerce initiated this tenth antidumping duty ("AD") administrative review

covering subject imports entered during the period of review ("POR"), August 1, 2012

through July 31, 2013.  See Certain Frozen Fish Fillets from the Socialist Republic of

Vietnam, 78 Fed. Reg. 60,834, 60,836 (Dep't Commerce Oct. 2, 2013) (initiation of

antidumping and countervailing duty administrative reviews and request for revocation in

part).  In this review, Commerce examined Hung Vuong Group ("HVG"), which includes

An Giang Fisheries Import & Export Joint Stock Company and other exporters of subject

merchandise, as the sole mandatory respondent.  See Certain Frozen Fish Fillets from

the Socialist Republic of Vietnam: Decision Memorandum for the Preliminary Results of

the 2012-2013 Antidumping Duty Administrative Review at 1 n.2, 2–3, PD 236, bar code

3213671-01 (July 2, 2014) ("Prelim. Decision Memo").  Commerce preliminarily assigned

HVG as well as all of the separate rate respondents not individually examined a weighted-

average dumping margin of $0.58 per kilogram.  Certain Frozen Fish Fillets from the

Socialist Republic of Vietnam, 79 Fed. Reg. 40,059, 40,061 (Dep't Commerce July 11,

2014) (preliminary results of the antidumping duty administrative review; 2012-2013).

Commerce preliminarily assigned a weighted-average dumping margin of $2.39 per

kilogram to those exporters subject to the order who did not rebut the presumption of

government control.  Id.  Commerce also preliminarily determined that CASEAMEX is

entitled to a separate rate because it demonstrated the absence of both a de jure and de facto government control.  Prelim. Decision Memo at 8.

In its final determination, Commerce calculated final weighted-average dumping margins of $0.97 per kilogram for HVG and the separate rate respondents.  Final Results, 80 Fed. Reg at 2,395.  The rate assigned to exporters who did not rebut the presumption of government control remained unchanged.  Id.  Commerce reconsidered its separate rate determination with respect to CASEAMEX and concluded that CASEAMEX failed to demonstrate independence in the selection of management.  See Final Decision Memo at 5; Memorandum re: Proprietary Analysis of Comment XXI: CASEAMEX – Separate Rate Status at 6, CD 184, bar code 3251356-01 (Jan. 7, 2015) ("Separate Rate Memo").

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2012), which grant the Court authority to review actions contesting the final determination in an administrative review of an antidumping duty order.  "The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.   Primary Surrogate Country Selection

Agifish and Anvifish challenge Commerce's selection of Indonesia as the primary surrogate country for valuing respondent's FOPs on the grounds that Indonesia is not economically comparable to Vietnam.  Anvifish Br. 13–24; Agifish Br. 8–11.  Additionally,

Anvifish argues that Commerce acted contrary to law in failing to weigh the relative economic comparability of the potential surrogate countries, see Anvifish Br. 21–24, and that Commerce's reasons for rejecting Bangladeshi data sources as the best available information for valuing respondent's FOPs were unsupported by the record.  Anvifish Br. 28–38.  Lastly, Agifish argues Commerce did not provide sufficiently compelling reasons to justify relying upon data considerations to select Indonesia over Bangladesh.  Agifish Br. 10–11.

In antidumping proceedings involving non-market economies ("NME"), Commerce generally calculates normal value ("NV") using the best available information to value respondents' FOPs and other costs and expenses "in a market economy country or countries considered to be appropriate by [Commerce]."  19 U.S.C. § 1677b(c)(1).  To the extent possible, Commerce uses FOPs from market economy countries that are—"(A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise."   19 U.S.C. § 1677b(c)(4).  Where merchandise is exported from a NME and Commerce determines available information does not permit the NV of subject merchandise to be determined using sales in the home market, Commerce determines NV on the basis of the value of the FOPs utilized in the production of the merchandise.  19 U.S.C. § 1677b(c)(1).  The statute provides that Commerce shall value FOPs based on the best available information from a surrogate market economy country or countries.  Id.  Commerce's regulatory preference

is to "value all factors in a single surrogate country."  19 C.F.R. § 351.408(c)(2) (2014).[2]

For the reasons that follow, Commerce's selection of Indonesia as the primary surrogate

country is reasonable and supported by substantial evidence.

### A. Economic Comparability

Agifish and Anvifish argue that Commerce's primary surrogate country selection,

Indonesia, is not economically comparable to Vietnam.  See Agifish Br. 8–11; Anvifish Br.

8–40.  Defendant argues Commerce reasonably concluded Indonesia is economically

comparable to Vietnam because 2011 GNI data reveals that Indonesia falls within a GNI

range that places it at a comparable level of development.  Def.'s Resp. Pls.' Mots. J.

Upon Agency R. Confidential Version 10, June 21, 2016, ECF No. 78 ("Def.'s Resp. Br.")

(citing Final Decision Memo at 9–10).  The court concludes Commerce's economic

comparability determination is reasonable.

The statute does not define economic comparability, nor does it provide a

methodology or criteria for evaluating what countries are significant producers of

comparable merchandise.  See 19 U.S.C. § 1677b(c)(4).  In AD administrative reviews

involving NMEs, Commerce has developed a methodology for selecting economically

comparable countries.  According to Commerce's practice, Commerce's Office of Policy

("OP") assembles "a list of potential surrogate countries that are at a comparable level of

economic development to the NME country," whose per capita GNIs fall within a range of

---

[2] Further citations to Title 19 of the Code of Federal Regulations are to the 2014 edition.

comparability to the GNI of the NME country ("OP List").[3]  See Import Admin., U.S. Dep't

Commerce, <u>Non-Market Economy Surrogate Country Selection Process</u>, Policy Bulletin

04.1 (2004) at 2, <u>available at</u> http://enforcement.trade.gov/policy/bull04-1.html (last

visited Jan. 18, 2017) ("Policy Bulletin 04.1").  The surrogate countries on the list "are not

ranked and should be considered equivalent in terms of economic comparability."  <u>Id.</u>

Commerce's methodology does not limit its consideration of potential surrogate countries

to those selected on its initial list.  <u>See id.</u>  Commerce's policy recognizes the importance

of data quality, and poor or limited data sometimes is a reason Commerce "will 'go off'

the OP list in search of a viable primary surrogate country."[4]  <u>Id.</u> at 4.

---

[3] Although Commerce's regulations provide that it uses per capita gross domestic product ("GDP")as the measure of economic comparability, Commerce began relying on per capita GNI as opposed to per capita GDP in 2007.  <u>Antidumping Methodologies in Proceedings Involving Non-Market Economy Countries: Surrogate Country Selection and Separate Rates</u>, 72 Fed. Reg. 13,246, 13,246 n.2 (Dep't Commerce Mar. 21, 2007) (request for comment); <u>see also</u> 19 C.F.R. § 351.408(b).  No party has challenged the use of GNI to determine economic comparability as contrary to Commerce's regulation.  Commerce's use of GNI to determine economic comparability has been considered reasonable.  <u>See, e.g.</u>, <u>Clearon Corp. v. United States</u>, 38 CIT __, Slip Op. 14-88, at *9–10 (July 24, 2014) (finding Commerce's reliance on GNI reasonable and in accordance with law).

[4] Although the Policy Bulletin indicates that Commerce's practice is to request a second list of surrogate countries, <u>see</u> Policy Bulletin 04.1 at 4, Commerce's surrogate country list put all parties on notice that Commerce's current practice is to consider "other countries on the case record that are significant producers of comparable merchandise if the record provides you adequate information to evaluate them."  <u>See</u> Letter to All Interested Parties re: 10th Administrative Review of Frozen Fish Fillets from the Socialist Republic of Vietnam: Surrogate Country List at Att. I, PD 58, bar code 3169015-01 (Dec. 22, 2013).  Commerce advised the parties that its practice is also to consider countries "that are not at the same level of economic development as Vietnam's, but still at a level of economic development comparable to Vietnam . . . only to the extent that data considerations outweigh the difference in levels of economic development."  <u>Id.</u>

Commerce reasonably concluded that Indonesia, despite its absence from the OP List, is economically comparable to Vietnam.[5]   Commerce acknowledged that Indonesia is less economically developed than Vietnam.[6]  Prelim. Decision Memo at 14–15; Final Decision Memo at 9; <u>see also</u> Letter to All Interested Parties re: 10th Administrative Review of Frozen Fish Fillets from the Socialist Republic of Vietnam: Surrogate Country List at Att. I, PD 58, bar code 3169015-01 (Dec. 22, 2013) ("OP List"). Nonetheless, after considering Indonesia's GNI in relation to Vietnam's and the six countries on the OP List, Commerce reasonably determined that Indonesia is economically comparable to Vietnam.[7]  Prelim. Decision Memo at 14–15; Final Decision

---

[5] Petitioners below, arguing that the countries on the OP List contained inadequate SV data for several significant FOPs, placed Indonesia's GNI and other information concerning Indonesia's economic comparability to Vietnam as well as Indonesian SV data on the record. <u>See</u> Petitioner's Surrogate Country Comments and Submission of Proposed Factor Values, PD 176-182, bar codes 3200753-01–07 (May 12, 2014); <u>see also</u> Final Decision Memo at 7–9 (citing Case Brief on Behalf of CFA, CD 170, bar code 3230459-01 (Sept. 19, 2014)).

[6] Although Commerce did not cite Indonesia's GNI specifically, Indonesia's 2011 GNI is $2,940 based on record evidence submitted by petitioners.  <u>See</u> Petitioners' Surrogate Country Comments and Submission of Proposed Factor Values at Ex. 2-B, PD 176–183, bar codes 3200753-01–07 (May 12, 2014).  The countries on the OP List included Bangladesh, Pakistan, Nicaragua, India, Bolivia, and the Philippines.  <u>See</u> OP List at 2.  According to the OP List, Vietnam's 2011 per capita gross national income ("GNI"), based upon figures from the World Bank's World Development Indicators database as of April 15, 2013, is $1,270.  <u>Id.</u>  The per capita GNIs of the other potential surrogate countries on the OP List ranged from $780 for Bangladesh to $2,210 for the Philippines.  <u>Id.</u>

[7] Anvifish argues that for Commerce's surrogate country selection to be supported by substantial evidence, Commerce is required to evaluate the relative economic comparability of the potential surrogate countries to that of Vietnam.  Anvifish Br. 21–24 (citing <u>Ad Hoc Shrimp Trade Action Comm. v. United States</u>, 36 CIT __, 882 F. Supp. 2d 1366 (2012) ("<u>Ad Hoc Shrimp I</u>"); <u>Ad Hoc Shrimp Trade Action Comm. v. United States</u>, 38 CIT __, 986 F. Supp. 2d 1362 (2014) ("<u>Ad Hoc Shrimp II</u>"); <u>Vinh Hoan Corp. v. United States</u>, 39 CIT __, 49 F. Supp. 3d 1285 (2015)).  The court is mindful that <u>Vinh Hoan</u> required Commerce to compare the relative economic comparability of countries on its OP List based on the record of that case.  <u>Vinh Hoan</u>, 39 CIT at __, 49 F. Supp. 3d at 1302–03.  In <u>Vinh Hoan</u>, the court found that the record did not demonstrate that Indonesian

(footnote continued)

**PUBLIC VERSION**

Memo at 9.  Commerce notes "[w]ithin a given range, differences in per-capita GNI

between countries do not imply any difference in level of economic development."  Final

Decision Memo at 11.  Commerce explains that Indonesia and Vietnam are economically

comparable "from the standpoint of their level of economic development based on GNI

as compared to Vietnam's level of economic development, and recognition of the fact that

the concept of 'level' in an economic development context necessarily implies a range of

GNIs, not a specific GNI."  Final Decision Memo 10.  From this statement, it is reasonably

discernible that Commerce views levels of economic comparability within the context of

worldwide GNI.  The court cannot say Commerce unreasonably determined Indonesia's

GNI is comparable to that of Vietnam in the context of world GNIs on the record in this

review.[8]

---

whole fish data was so superior to Bangladeshi whole fish data that weighing relative GNIs "would not improve Commerce's selection of the best available information."  Id., 39 CIT at __, 49 F. Supp. 3d at 1304–05 (citing Ad Hoc Shrimp I, 36 CIT at __–__, 882 F. Supp. 2d at 1374–75).

  Anvifish's argument that Vinh Hoan and Ad Hoc Shrimp control here is misplaced.  Here, Commerce found that Indonesian data is vastly superior to other potential surrogate countries because Indonesian data is the only data source that satisfies the breadth of SV selection criteria for whole live fish and that Indonesian data provides significantly more specific fingerling SV data.  Final Decision Memo at 18–19.  Therefore, here Commerce did not need to engage in a comparison of relative GNI proximity for its surrogate country selection to be reasonable.

[8] Anvifish argues that Commerce's rationale for considering Indonesia and Vietnam economically comparable would enable Commerce to consider "any and all countries" economically comparable, which would essentially eviscerate the economic comparability requirement in the statute.  See Anvifish Br. 14.  Agifish echoes these concerns, arguing that Commerce "relied on nothing except its discretion" in concluding Vietnam and Indonesia are economically comparable.  Agifish Br. 10.  Considering the GNI of the potential surrogate countries on the OP List in the context of the worldwide range of GNIs, which Commerce acknowledges, see Final Decision Memo at 11, Commerce's determination that Indonesia is economically comparable to Vietnam is reasonable.

  Nonetheless, the court is concerned by Commerce's reluctance to set guidelines for evaluating economic comparability even if it does not use the GNI range of the countries OP List

(footnote continued)

Commerce has authority to consider countries proposed by interested parties that are not at the same level of economic development but that it reasonably concludes are nonetheless economically comparable.  See 19 U.S.C. § 1677b(c)(4).  Commerce reasonably concluded that the poor data quality of the small set of countries that are producers of frozen fish fillets, both on the OP List and more generally, permitted it to consider potential surrogate countries not at the same level of economic development, albeit still economically comparable.  Final Decision Memo at 10.

Agifish and Anvifish argue that Commerce's selection of a potential surrogate country that had been removed from the OP List amounts to an impermissible expansion of the statutory economic comparability requirement.  See Agifish Br. 10–11; Anvifish Br. 13–17.  Specifically, Anvifish argues that Commerce's OP consciously removed Indonesia from the list of potential surrogate countries because its "galloping GNI that catapulted Indonesia outside of the GNI bookends established by the Department's OP memoranda."  Anvifish Br. 15.  Anvifish's speculation that Indonesia's removal from the OP List since previous reviews resulted from a determination that Indonesia is not

---

to do so.  The opacity and brevity of Commerce's economic comparability analysis makes it difficult for parties to predict what potential surrogate countries may be considered for SV purposes.  The court asked Defendant to clarify Commerce's approach to defining the bounds of economic comparability.  See Confidential Letter from Court Concerning Questions for Oral Argument at 3–4, Nov. 7, 2016, ECF No. 112.  In response, Defendant explained that Commerce looks at each review on a case-by-case basis, and uses "no set formula" for determining when a potential surrogate country will be deemed economically comparable.  See Conf. Oral Argument at 00:06:21–00:06:55, Dec. 8, 2016, ECF No. 120.  Even if the record here does not render Commerce's economic comparability determination unreasonable or unsupported by the record because Commerce cited specific reasons for the superiority of Indonesian data, the court is troubled that Commerce's approach to determining economic comparability generally makes it difficult for the court to review the reasonableness of that determination.

economically comparable is unsupported by the record.  It does not follow that Commerce

deliberately removed Indonesia because it is no longer economically comparable simply

from the fact that Indonesia was included on OP Lists in prior reviews.  Further, neither

Agifish nor Anvifish cites authority preventing Commerce from selecting off-list potential

surrogate countries whose GNI fall outside the range of GNIs established by the OP List

or supporting the notion that the OP List sets the outer limits of economic comparability.[9]

Anvifish ignores the notion that the size of the OP List and its range of per capita GNIs

may vary from review to review and that the range of GNIs on the list is largely a function

of how many countries Commerce opts to place its initial list.  <u>See</u> Policy Bulletin 04.1 at

2.  Anvifish points to nothing in the statute or in Commerce's practice that requires

economic comparability to be defined by the GNI range of the potential surrogate

---

[9] That Commerce has elected to implement a practice of initially considering five or six potential surrogate countries does not necessarily set the limits of economic comparability.  <u>See</u> OP List at Att. I.  The OP generates the list of potential surrogate countries based upon their per capita GNI in relation to the NME country under consideration. Policy Bulletin 04.1 at 2.  Although the OP List instructs that countries at the same level of economic development are given equal weight in surrogate country selection, it provides that countries at a comparable level of economic development may be selected "to the extent that data considerations outweigh the difference in levels of economic development." <u>Id.</u> Anvifish points to nothing in Commerce's practice indicating that Commerce intends to set the bounds of economic comparability by the upper and lower limits of the OP List.

countries on the OP List.[10]   Nor do any cases cited by Anvifish support the notion that the

range of GNIs on Commerce's OP List sets the outer limits of economic comparability.[11]

---

[10] Anvifish argues that Commerce's economic comparability analysis is contrary to law because it reversed the order of its surrogate country selection practice by emphasizing data considerations at the expense of economic comparability considerations.  Anvifish Br. 16.  This argument relies on Anvifish's unsupported premise that the OP List sets the limits of economic comparability.  Here, Commerce reasonably determined that all the data for both whole live fish and non-fish FOPs from the countries on the OP List suffered from deficiencies rendering them inadequate for SV purposes.  Final Decision Memo at 10–15.  Therefore, Commerce acted consistently with its practice by only considering countries that are at the same level of economic development or at a comparable level, after determining data from countries at the same level of economic development were inadequate.  See id. at 10.

[11] Anvifish argues several cases limit Commerce's selection of a country outside the range of GNIs on its OP List.  See Anvifish Br. 17–21.  None of the holdings of these cases support any such premise.  See Dorbest Ltd. v. United States, 604 F.3d 1363, 1371–72 (Fed. Cir. 2010) (holding Commerce must select data to value FOPs from economically comparable countries "except where such data were not available or were irretrievably tainted by some statistical flaw"); Dupont Teijin Films v. United States, 38 CIT __, 997 F. Supp. 2d 1338, 1345 (2014) (upholding Commerce's revised surrogate country selection of South Africa, which was among the countries on the OP List from the same review, after consideration of all data placed on the record); Jiaxing Brother Fastener Co. v. United States, 38 CIT __, __, 961 F. Supp. 2d 1323, 1331–32 (2014) (holding it reasonable for Commerce to decline to select potential surrogate country not included on the OP List); Foshan Shunde Yongjian Housewares & Hardwares Co. v. United States, 37 CIT __, 896 F. Supp. 2d 1313 (2013) (holding Commerce's selection of Indonesia was reasonable because Commerce reasonably concluded Indonesia met all the requirements for surrogate country selection and that Commerce reasonably declined to include India on the OP List because it had a lower GNI than any country on the list and was therefore "the least economically comparable to China"); Dupont Teijin Films v. United States, 37 CIT __, 896 F. Supp. 2d 1302, 1307–08 (2013) (holding Commerce had not supported its conclusion that India was economically comparable to the NME in question because it failed to explain its refusal to consider 2009 GNI data and a surrogate country list from another review placed on the record by a party); Vinh Hoan Corp. v. United States, 39 CIT __, __, 49 F. Supp. 3d 1285, 1296 (holding that Commerce's selection of a surrogate country without considering all GNI data on the record was contrary to law and requiring Commerce to consider all record data in its economic comparability analysis).

Anvifish also implies that Commerce's recent decisions in other proceedings confirm a practice of identifying countries within a GNI band between the lowest and highest country identified on the OP List as being economically comparable.  GDLSK Respondents' Reply Br. 13–14, Sept. 9, 2016, ECF No. 101 (citing Pure Magnesium From the People's Republic of China, 79 Fed. Reg. 94 (Dep't Commerce Jan. 2, 2014) (final results of antidumping duty administrative review; 2011-2012) and accompanying Issues and Decision Memorandum for the Final Results

(footnote continued)

### B. Significant Producer of Comparable Merchandise

Commerce reasonably concluded that Indonesia is a significant producer of

comparable merchandise because export information from Fisheries Statistics, an online

data source published by the Food and Agriculture Organization of the United Nations,

indicates that Indonesia, along with Bangladesh, India, Nicaragua, Pakistan, and the

Philippines, are exporters of fish fillets.  Final Decision Memo at 15.  In the second step

of Commerce's primary surrogate country selection methodology, Commerce identifies

---

of the 2011-2012 Administrative Review at 5, 8–9, A-570-832, (Dec. 26, 2013), <u>available at</u>
http://ia.ita.doc.gov/frn/summary/prc/2013-31412-1.pdf (last visited Jan. 18, 2017)
("Magnesium from the PRC I&D"); <u>Certain Activated Carbon From the People's Republic of China</u>,
80 Fed. Reg. 61,172 (Dep't Commerce Oct. 9, 2015) (final results of antidumping duty
administrative review; 2013–2014) and accompanying Certain Activated Carbon from the
People's Republic of China: Issues and Decision Memorandum for the Final Results of the
Seventh Antidumping Duty Administrative Review at 5–7, A-570-904, (Oct. 2, 2015), <u>available at</u>
http://ia.ita.doc.gov/frn/summary/prc/2015-25810-1.pdf (last visited Jan. 18, 2017)
("Activated Carbon from the PRC I&D")).  Neither proceeding cited by Anvifish provides that the
OP List sets the outer bounds of economic comparability.

In Magnesium from the PRC I&D, Commerce does not state that it considers potential
surrogate countries whose GNIs fall outside the GNI range established by the OP List not
economically comparable.  <u>See</u> Magnesium from the PRC I&D at 18.  Rather, Commerce explains
that it considers a country with a GNI "several times" that of the potential surrogate country on the
OP List with the highest GNI not to be economically comparable.  Magnesium from the PRC I&D
at 18 n.71.  As an initial matter, even had Commerce said what Anvifish implies, that would not
make Commerce's practice reasonable.  Nonetheless, here Indonesia's GNI is $2,940.
Petitioners' Surrogate Country Comments and Submission of Proposed Factor Values at Ex. 2-
B, PD 176–183, bar codes 3200753-01–07 (May 12, 2014).  The GNI of the Philippines, which is
the country on the OP List with the highest GNI on the OP List, is $2,210.  OP List at Att. I.

In Activated Carbon from the PRC I&D, Commerce acted consistently with its practice, as
applied here, because it declined to consider a potential surrogate country that is at a less
comparable level of economic development.  Activated Carbon from the PRC I&D at 6–7.  In
Activated Carbon from the PRC I&D, Commerce concluded Thailand is at the same level of
economic development and fulfills its other surrogate country selection criteria, so Commerce
concluded there was no need to consider countries at a comparable level of economic
development.  <u>Id.</u>  Nothing in this statement of practice precludes Commerce from considering
countries at a comparable level of development where it reasonably concludes the potential
surrogate countries at the same level of economic development do not fulfill the other selection
criteria.

countries from the OP List that produce comparable merchandise. Policy Bulletin 04.1 at 2–3. Commerce also "determines whether any of the countries which produce comparable merchandise are 'significant' producers of that comparable merchandise." Id. at 3–4. No party challenges Commerce's finding that Bangladesh, India, Indonesia, Nicaragua, and Pakistan are significant producers of comparable merchandise, and this determination is reasonable in light of the evidence on the record.

### C. Data Quality

Agifish and Anvifish argue that Commerce's finding that Indonesian data is the best available data for valuing respondents' FOPs is not supported by substantial evidence. See Agifish Br. 10–11, Anvifish Br. 30–38. Commerce reasonably determined that Indonesian data for valuing respondents' FOPs is sufficiently superior to the other SV data alternatives to warrant selecting a primary surrogate country at a comparable, but not the same, level of economic development.

Under Commerce's primary surrogate country selection methodology for NME proceedings, if more than one country is economically comparable and a significant producer of comparable merchandise, Commerce will select the country with the best factors data. Policy Bulletin 04.1 at 4. Commerce selects the country with the best factors data based upon the data's: (1) specificity to the input; (2) tax and import duty exclusivity; (3) contemporaneity with the period of review; (4) representativeness of a broad market average; and (5) public availability. Id.

Commerce reasonably determined that, based on the totality of the circumstances, Indonesian SV data is "vastly superior" to Philippine and Bangladeshi data for valuing

respondents' whole live fish and non-fish FOPs.  Final Decision Memo at 17.  Commerce

determined that Bangladeshi and Philippine data is inadequate for valuing respondent's

whole live fish FOP because of deficiencies regarding the specificity and

representativeness of a broad market average of both sources as well as reliability

concerns with the Bangladeshi data source.  Id. at 18–19.  Given the vertical integration[12]

of HVG and many separate rate respondents, Commerce also reasonably concluded that

the availability of quality SV data for significant nonfish FOPs should factor considerably

in surrogate country selection.  Id. at 18.

Commerce reasonably supported its conclusion that Indonesian SV data to value

respondents' whole live fish FOP is superior to both Philippine and Bangladeshi data by

specifically highlighting extensive record evidence to support its conclusion.[13]  First,

Commerce reasonably supported its conclusion that Bangladeshi Department of

Agriculture Marketing ("DAM") data is significantly less representative of a broad market

average than Indonesian data because: (1) the DAM data represents a significantly less

robust volume of production versus the alternative sources;[14] (2) the Indonesian

---

[12] Commerce uses the term "integrated" to describe respondent HVG's production here because it purchases pangasius fingerlings, i.e. juvenile fingerlings, "which grow in ponds until they are ready to be harvested and processed, rather than purchasing all of the whole live *pangasius* they consume from suppliers."  Final Decision Memo at 18.

[13] It is unclear from Anvifish's brief whether it challenges Commerce's SV data selection for the whole live fish FOP independently from its challenge to Commerce's surrogate country selection. See Anvifish Br. 24–37.  To the extent Anvifish asserts a freestanding challenge to Commerce's determination that Indonesian whole fish data represents the best available information to value respondent's whole live fish FOP, Commerce's determination is reasonable for the reasons discussed below.

[14] Commerce noted that 2012 Indonesian Aquaculture Statistics data represents 293,000 metric tons ("mt"), whereas Philippine Fisheries Statistics represents only 72 mt and Bangladeshi DAM data represents 39,000 mt of production.  Final Decision Memo at 23–24.

Aquaculture Statistics ("IAS") data represents superior coverage of the market relative to

that of the DAM data; and (3) the coverage of DAM data has inexplicably declined

dramatically while Bangladeshi production of pangasius rose dramatically.[15]   Final

Decision Memo at 23–25.[16]

 Second, Commerce reasonably concluded that DAM data is unreliable because of

its poor data quality vetting procedures, technical difficulties with its software, and

---

[15] Commerce deemed significant that IAS data covers 29 of 33 pangasius producing districts in Indonesia, including the largest Indonesian pangasius producing district, whereas DAM data represents 25 of 68 districts and is missing information from Mymensingh, the largest pangasius producing district in Bangladesh.  Final Decision Memo at 24.

[16] Anvifish argues DAM prices do represent a broad market average because the DAM data represents actual spot prices, segregated by size for most major pangasius producing districts in Bangladesh.  Anvifish Br. 33–36.  The fact that the DAM data may represent actual prices does not ameliorate the fact that the DAM database does not include data from Mymensingh, the largest pangasius producing region in Bangladesh.

 Anvifish also argues the record contains price data from Mymensingh in the form of hardcopy official DAM pricing circulars.  Id. at 34.  Anvifish argues that the fact that this data has not been posted online does not detract from the expansive coverage of the DAM online data.  Id. Commerce considered these arguments and did not find those explanations persuasive, see Final Decision Memo 24–25.  Commerce also reasonably dismissed speculation that pangasius data from Mymensingh may be included with other districts to explain the lack of Mymensingh data because "there is no affirmative evidence that Mymensingh-sourced pangasius sales are included" in sales of other districts and there is evidence that DAM may be unable to publish price data from all districts in a given year because of technical difficulties and logistical limitations.  Id. at 25.  It is reasonably discernible that Commerce declined to consider hardcopy DAM pricing circulars to satisfy its broad market coverage concerns because these unvetted worksheets, not yet submitted as part of the DAM online database, are unreliable because Commerce considered DAM online data itself not to be reliably vetted.  See id. at 26.  The court declines to reweigh the evidence.

 Anvifish also argues that other official data sources corroborate the DAM data, which undermines Commerce's negative reliability and broad market average findings.  Anvifish Br. 36– 37.  Anvifish argues these sources corroborate the DAM price surveys and fill the gaps in the DAM data.  Id.  As for the DAM hardcopy pricing circulars, Commerce considered this evidence, and found that other record evidence, including an affidavit from a DAM official indicating that DAM pricing contains anomalous data and contains errors, to outweigh this and other data Anvifish argues indicate its reliability.  See Final Decision Memo at 27.  Moreover, Commerce also noted Indonesian data suffers from no similar reliability concerns, which Anvifish does not dispute.  See id.; Anvifish Br. 36–37.  The court considers Commerce's determinations reasonable and will not reweigh the evidence.

statistical anomalies in the data that were left uncorrected.[17]  Id. at 27–28.  Commerce's

conclusion as to the superiority of Indonesian data is further supported by the fact it found

no such reliability concerns with Indonesian data.  Id. at 28.

Third, the record reasonably supports Commerce's conclusion that Indonesian

data is the most specific data on the record because Commerce credited record evidence

indicating that the DAM data contained dead fish over other record evidence that it did

not.[18]  Id. at 25–26.  Commerce weighed the record evidence and reasonably concluded

that the inclusion of dead fish in the DAM data distorts the SV for this FOP.  Id. at 27.  In

contrast, Commerce reasonably determined that IAS data suffered from fewer such

---

[17] Anvifish argues that any reliability concerns should have been alleviated by the presence of other corroborating studies on the record reflecting farmgate prices for pangasius based on surveys from the Mymensingh district in Bangladesh.  Anvifish Br. 36 (citing Respondent's Surrogate Comments at Exs. 15A, 15B, 16, 16A, 16B, 17A, PD 156–157, bar codes 3200754-01–02 (May 12, 2014)).  Commerce's conclusion that DAM data is not reliable is based in part upon affidavits describing DAM's data vetting procedures.  Final Decision Memo at 27.  Other sources on the record containing prices from Mymensingh do not fill gaps for online DAM data that lacks data from Mymensingh.  Nor is it unreasonable for Commerce to consider DAM data unreliable where independent record evidence indicates DAM has inadequate vetting procedures despite the presence of another data source corroborating DAM's prices.  Anvifish points to no record evidence undermining Commerce's conclusions regarding deficiencies in DAM's data vetting procedures, and the court declines to reweigh the evidence.

[18] Anvifish attempts to undermine the affidavits Commerce credited as supporting its finding that DAM data included dead fish, arguing that they were based on secondhand hearsay evidence.  Anvifish Br. 31–32.  Commerce considered the credibility of the competing affidavits on the record concerning the possible inclusion of dead fish in the DAM data, including affidavits detailing interviews with DAM officials, affidavits detailing interviews with pangasius traders in Bangladesh, a pangasius market survey indicating a significant proportion of fish are dead or sluggish upon arrival in Bangladeshi markets, an affidavit indicating both live and dead fish are sold in Bangladeshi markets, and an article published by the U.S Agency for International Development indicating up to 29 percent of pangasius sold in Bangladeshi wholesale markets are dead.  Final Decision Memo at 26.  Commerce found inaccuracies in the information placed on the record indicating that dead fish are excluded from the DAM data.  Id.  For this reason, Commerce discounted the probative value of such information.  Final Decision Memo at 26.  Commerce's conclusion is reasonable and the court declines to reweigh the evidence.

specificity concerns because Commerce credited an affidavit submitted from the director

of IAS from 2011 detailing specific steps taken to ensure the IAS data does not include

dead fish based.[19]  Final Decision Memo at 25.  Commerce's determination that Philippine

FS data is less specific relative to Indonesian IAS data is also supported by the record.

Commerce found Philippine FS data may include prices for further processed fish, not

just whole live fish, while Indonesian IAS data suffered from no such concerns.  Id.

    Lastly, Commerce's determination as to the superiority of Indonesian IAS data is

supported by Commerce's finding that Indonesian IAS and Philippine FS data are

contemporaneous because they overlap the POR to varying degrees,[20] while DAM data

is not contemporaneous.[21]    Final Decision Memo at 23.   The record also supports

---

[19] Anvifish does not point to record evidence detracting from Commerce's finding that IAS data is specific or that it is more specific than DAM data.  Rather, Anvifish argues that the Bangladeshi pangasius industry is homogenous and substantially similar to the pangasius industry in Vietnam because nearly its entire production is the same species as that produced by respondents produced by substantially similar cultivation methods.  Anvifish Br. 29.  Anvifish argues that Commerce failed to consider these similarities in making its specificity finding.  Id.  However, Commerce did not find that Bangladeshi DAM data is not specific to respondents' whole live fish FOP, but rather that it is less specific than Indonesian data because of the inclusion of dead fish.  Final Decision Memo at 27.  Even if the similarities between the Bangladeshi and Vietnamese pangasius industries are taken as true, they do not undermine the reasonableness of Commerce's selection of Indonesian data in light of the particular specificity, representativeness, and reliability concerns Commerce highlighted in the DAM data.

[20] Anvifish argues that Commerce erred in concluding the IAS data is contemporaneous because the data on the record provides non-POR data for 2010 and 2011, and Anvifish argues the 2012 IAS data only includes data for five months within the POR.  Anvifish Br. 30.  In light of the IAS's overlap with the POR, Commerce reasonably concluded the IAS data is contemporaneous.

[21] Anvifish argues that Commerce erroneously concluded that DAM data on the record covers the immediately preceding POR.  Anvifish Br. 30.  In support of its argument, Anvifish submitted DAM whole fish weekly wholesale pangasius pricing data for each month from August 2012 through July 2013.  See App. Pl.'s Mem. Law Supp. Rule 56.2 Mot. J. Upon Agency R. at Doc. 9, Oct. 9, 2015, ECF Nos. 50-9–12.

    On June 6, 2016, Defendant-Intervenors Catfish Farmers of America, an association of

(footnote continued)

Commerce's conclusion that Indonesian SV data sources are significantly superior to

Bangladeshi SV data sources on the record for valuing respondents' non-fish FOPs.

Commerce reasonably concluded that the fingerling FOP had a significant impact on

HVG's normal value because it is significantly integrated.  Final Decision Memo at 18.

Commerce also reasonably determined that the Indonesian SV data to value fingerlings

was significantly more specific because Bangladeshi data does not provide size-specific

fingerling pricing.[22]  Id. at 18–19.  Further, Commerce found that Indonesian SV data for

---

U.S. catfish processors and growers, and individual U.S. catfish processors, America's Catch, Alabama Catfish Inc., Heartland Catfish Company, Pride of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively "CFA") filed a motion to strike this material along with all references to such material in Anvifish's memorandum of law because this data had been submitted in support of Anvifish's motion despite the fact that it was not part of the administrative record in the underlying proceeding.  Def.-Intervenors' Mot. Strike, June 6, 2016, ECF No. 71.  Anvifish responded that it "intended to submit, and . . . believe[s] that [it], in fact, did submit the DAM online data in Document 9 to the Department in Exhibit 11 of [its] May 12, 2014, Surrogate Value Submission."  Pls.' Resp. Opp'n Def.-Intervenor's Mot. Strike 2, June 20, 2016, ECF No. 72.  After reviewing the parties' submissions and a teleconference held with the parties, see Teleconference, June 23, 2016, ECF No. 84, the court denied CFA's motion to strike.  Mem. and Order, June 23, 2016, ECF No. 85.  The court deferred consideration of whether the DAM pricing submitted by Anvifish in its appendix to its memorandum of law should be considered in evaluating Commerce's surrogate country selection.  Id. at 3.

      Even assuming that DAM data on the record is contemporaneous, the court finds Commerce's determination that IAS data is superior to DAM data to be supported by substantial evidence.  Commerce minimized the importance of its finding that DAM data is non-contemporaneous in concluding that DAM data is not the best available information.  See Final Decision Memo at 23.  Commerce focused on the DAM data's "serious shortcomings regarding representation of a broad market average, its specificity and reliability."  Id.  Commerce's assessment of the relative superiority of IAS data over DAM data would be reasonable even if Commerce's finding that the IAS data is more contemporaneous is not supported by substantial evidence.  See id.  Therefore, the court need not determine whether the record evidence submitted by Anvifish here was on the record before Commerce to conclude that Commerce's determination is reasonable.

[22] Anvifish asserts that the Bangladeshi Aquaculture Study is specific to pangasius fingerlings.  Anvifish Br. 37.  However, Anvifish does not argue that this data source contains size-specific values.  Id.  Nor does Anvifish undermine Commerce's determination that the size of fingerlings

most non-fish FOPs are not representative of a broad market average because they do not reflect country-wide data whereas Indonesian import data on the record does represent country-wide data.[23]  Id. at 19.   Commerce reasonably concluded that Indonesian SV data sources are generally more contemporaneous because it found that no party submitted contemporaneous import statistics from Bangladesh for respondents' non-fish FOPs, whereas contemporaneous import statistics were on the record for Indonesia and the Philippines.[24]  Id. at 14.

---

purchased would impact the pricing of this input.  Therefore, even if the fingerling data is species-specific, Commerce still reasonably determined that Indonesian fingerling data is more specific because it includes size-specific values.

Anvifish does not address Commerce's remaining SV criteria for any of these non-fish FOPs.  See Anvifish Br. 37.  Commerce's practice for selecting the best available information favors selecting a data source that satisfies the breadth of its criteria, not just one.  See Final Decision Memo at 17 (citing Fifth Administrative Review of Certain Frozen Warmwater Shrimp from the People's Republic of China: Issues and Decision Memorandum for the Final Results at 10, A-570-893, (Aug. 12, 2011), available at http://ia.ita.doc.gov/frn/summary/prc/2011-21259-1.pdf (last visited Jan. 18, 2017)).

[23] Commerce cited the example of salt, where the Bangladeshi data source on the record is a newspaper article reflecting a single company's experience from 2008 versus contemporaneous country-wide Indonesian import data.  Final Decision Memo at 19.

[24] Anvifish implies that Commerce relied upon contemporaneity and broad market average concerns to the exclusion of specificity in concluding Indonesian data was the best available for valuing non-fish FOPs.  Anvifish Br. 37.  Commerce did examine product specificity of the contested non-fish FOPs, and it reasonably concluded Indonesian data is product specific for most significant non-fish FOPs, including farming factors.  See Final Decision Memo at 39–40 (fish feed); id. at 41–42 (lime); id. at 44–45 (antibiotics); id. at 46 (farming nutrition).  Anvifish does not contest these findings.  Therefore, Anvifish's implication that Commerce failed to consider specificity in making its determination is unfounded.

Moreover, Anvifish does not cite record evidence undermining Commerce's findings that Bangladeshi non-fish SV data is non-contemporaneous or not representative of a broad market average.  See id.  Commerce's practice for selecting the best available information favors selecting a data source that satisfies the breadth of its criteria, not just one.  See Final Decision Memo at 17 (citing Fifth Administrative Review of Certain Frozen Warmwater Shrimp from the People's Republic of China: Issues and Decision Memorandum for the Final Results at 10, A-570-893, (Aug. 12, 2011), available at http://ia.ita.doc.gov/frn/summary/prc/2011-21259-1.pdf (last

(footnote continued)

### D. Conclusion

For the reasons discussed, Commerce's selection of Indonesia as the primary surrogate country is reasonable. Commerce reasonably found that Indonesia is economically comparable to Vietnam, a significant producer of comparable merchandise, and offers the best available information for valuing respondents' fish and non-fish FOPs. Final Decision Memo at 9, 15. While Commerce acknowledged that Indonesia is less economically comparable to Vietnam as compared to the countries on the OP List, Commerce reasonably concluded that data considerations, particularly those relating to the primary input for the subject merchandise whole live fish and the fingerling FOP outweigh the fact that Indonesia is not at the same level of economic development as Vietnam. Final Decision Memo at 10. Therefore, the court sustains Commerce's primary surrogate country selection.

## II. Commerce's Analysis of Specific Surrogate Values

Agifish challenges Commerce's SV data selections for antibiotics, nutrition, packing tape, packing strap, fish feed, fish waste byproducts, trucking expenses, and brokerage and handing expenses. See Agifish Br. 8–16; 25–50. Agifish accepts Commerce's selection of a SV data source to value respondent's fingerling FOP, but it objects to various determinations Commerce made in calculating the SV of fingerlings in this review. Id. at 16–25. Defendant refutes all these challenges and argues Commerce's final determination should be sustained in all respects. See Def.'s Resp. Br. 38–59. The

---

visited January 18, 2017)). Even if Bangladeshi data offered specific data for respondents' non-fish FOPs, Anvifish cites no authority suggesting that finding a data source is specific is sufficient for SV data selection purposes.

court sustains Commerce's SV of fingerlings as well as Commerce's SV data selections for antibiotics, nutrition, packing tape, packing strap, fish waste byproducts, trucking expenses, and brokerage and handling expenses.   However, the court remands Commerce's SV data selection for fish feed for further explanation and consideration.

In NME cases, Commerce obtains a normal value by adding the value of the FOPs used to produce the subject merchandise and "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."   19 U.S.C. § 1677b(c)(1). Commerce values the FOPs "based on the best available information regarding the values of such factors in a market economy country or countries."   Id.   Commerce's methodology for selecting the best available information evaluates data sources based upon their: (1) specificity to the input; (2) tax and import duty exclusivity; (3) contemporaneity with the period of review; (3) representativeness of a broad market average; and (5) public availability.   Policy Bulletin 04.1 at 4.   Commerce uses the same methodology to calculate SV of byproducts, which offset production costs incurred by a respondent, generated during the production process.   See Final Decision Memo at 80– 82 (citing 19 U.S.C. § 1677b(c); see also Guangdong Chems. Imp. & Exp. Corp. v. United States, 30 CIT 1412, 1422, 460 F. Supp. 2d 1365, 1373 (2006)); Tianjin Magnesium Int'l Co., v. United States, 34 CIT 980, 993, 722 F. Supp. 2d 1322, 1336 (2010) (explaining that "[t]he antidumping statute does not prescribe a method for calculating byproduct offsets instead leaving the decision to the technical expertise of the Department."). Commerce's practice for selecting the best available information to value individual FOPs favors selecting a data source that satisfies the breadth of its selection criteria where

possible.  See Final Decision Memo at 17 (citing Fifth Administrative Review of Certain

Frozen Warmwater Shrimp from the People's Republic of China: Issues and Decision

Memorandum for the Final Results at 10, A-570-893, (Aug. 12, 2011), available at

http://ia.ita.doc.gov/frn/summary/prc/2011-21259-1.pdf (last visited Jan. 18, 2017)).

### A. Antibiotics

Agifish challenges Commerce's selection of Indonesian import data under HTS

2941.90, which covers "Antibiotics, Nesoi," as not specific to the inputs used by

respondents because the HTS category covers only the antibiotic penicillin and the record

demonstrates respondents used other medicines.  Agifish Br. 11–14.  Defendant counters

that Commerce reasonably used HTS 2941.90, which covers amoxicillin, ampicillin, and

penicillin because HVG did not identify which specific antibiotics it uses.  Def.'s Resp. Br.

39.  Commerce's selection of Indonesian import data to value this FOP is reasonable in

light of the record evidence.

Commerce found that the HTS category is specific to respondents' antibiotics FOP

because HVG only described this input as "antibiotics" and the HTS subcategory covers

amoxicillin, ampicillin as well as penicillin.  Final Decision Memo at 44.  Given that HTS

2941.90 covers "Antibiotics, Nesoi," it is not unreasonable for Commerce to conclude that

this description matches the general description of "antibiotics" given by HVG.  Nothing

in HTS 2941.90 refers specifically to penicillin.  Commerce also found Indonesian import

data contemporaneous, publicly available, representative of a broad market average and

tax and duty free.  Id. at 43–44.

Commerce found Foreign Trade Statistics of Bangladesh not to be specific to respondents' medicines and antibiotics because this source does not include data for medicines/antibiotics.  Id. at 44.  Commerce found this source non-contemporaneous because it covers July 2009 to June 2010, which is outside the POR.  Id. at 44. Commerce deemed the Bangladeshi Foreign Trade Statistics unreliable because respondents included only an excerpt that is insufficient to confirm the source's reliability. Id. at 45.  Therefore, Commerce reasonably determined Indonesian import data under HTS 2941.90 is the best available information for valuing respondents' antibiotics FOP.

Agifish argues that Indonesian HTS 3004.20 is more specific to the inputs used by HVG.  Agifish Br. 13.  However, HTS 3004.20, covers "Medicaments (excluding goods of heading 30.02, 30.05 or 30.06) consisting of mixed or unmixed products for therapeutic or prophylactic uses, put up in measured doses (including those in the form of transdermal administration systems) or in forms or packing for retail sale): Containing other antibiotics."  See id.  Agifish points to no record evidence indicating respondent purchased its antibiotics in measured doses, nor does Agifish cite any record evidence undermining the reasonableness of Commerce's conclusion that HTS 2941.90 is specific to the antibiotics HVG described in its questionnaire response.   Therefore, Commerce's conclusion is supported by substantial evidence.

### B. Nutrition

Agifish argues Commerce's selection of Indonesian HTS 2936.90, which covers "Vitamins, [Including] Natural Concentrates Etc., Nesoi," is less specific to respondents' nutrition FOP because this HTS subheading is limited to vitamins, whereas HTS

2309.90.20 includes other feed supplements an additives.  Agifish Br. 14–15.  Defendant responds that Commerce reasonably concluded this HTS subcategory is specific to respondents' nutrition FOP because HVG described this input as "mostly vitamins."  Def.'s Resp. Br. 39.  Commerce's SV data selection for nutrition is reasonable.

Commerce reasonably found Indonesian import data under HTS 2936.90 to be specific because HVG describes its nutrition FOP as "mostly vitamins (E, A, C, B), ascorbic acid and minerals to provide healthy supplements to fish."  Final Decision Memo at 46 (quoting Section D Questionnaire Response – An Giang Fisheries Import and Export Joint Stock Company at 18, CD 65, bar code 3182100-01 (Feb. 19, 2014)).  Commerce concluded that Indonesian import data is contemporaneous, publicly available, representative of a broad market average, and tax and duty exclusive.  Id.

In contrast, Commerce found Foreign Trade Statistics of Bangladesh not to be specific to respondents' medicines and antibiotics because these statistics do not include data for nutrition.  Id. at 47.  Commerce also found this Bangladeshi data source not to be contemporaneous because it covers July 2009 to June 2010, which is outside the POR and unreliable because respondents failed to include a sufficient excerpt from this data source to confirm its reliability.  Id.  Therefore, Commerce reasonably determined Indonesian import data under HTS 2936.90 is the best available information for valuing respondents' antibiotics FOP.

Agifish cites no record evidence making it unreasonable for Commerce to value HVG's nutrition FOP using import data covering vitamins in light of HVG's brief response describing this input as mostly vitamins.  Even though HVG did not indicate in its

questionnaire responses that its nutrition consisted exclusively of vitamins, Agifish points

to no record evidence indicating that import data covering only vitamins and not including

other food additives would not accurately reflect the value of respondents' nutrition FOP.

Therefore, Commerce's reasonably determined that HTS 2936.90 is specific to the

nutrition used by respondents.

### C. Fingerlings

#### 1. Commerce's Use of a Conversion Factor

Agifish challenges Commerce's use of a conversion factor drawn from an affidavit

from Dr. Djumbuh Rukmono, an official from the Indonesian Ministry of Marine Affairs and

Fisheries ("Rukmono Affidavit"), to obtain a size-specific SV data for HVG's fingerlings on

a per-kilogram basis because Agifish argues the piece-per-kilogram conversion factor

contained in the affidavit is unreliable.[25]   Agifish Br. 16–23.   Defendant counters that

Commerce reasonably used the Rukmono Affidavit's conversion factor because it is

reliable and using the conversion factor is necessary to capture the decline in number of

fingerlings per kilogram when fingerlings increase in size.  Def.'s Resp. Br. 42 (citing Final

Decision Memo at 32).

Commerce's determination to use a conversion factor to obtain size-specific values

is reasonable because HVG reported the number of fingerlings purchased on a per

---

[25] Agifish does not challenge Commerce's determination that the Rukmono Affidavit represents
the best available information to value respondents' fingerling FOP.  Agifish Br. 17.  Therefore,
the court does not review the reasonableness of Commerce's selection of the Rukmono Affidavit
to value respondents' fingerlings.

kilogram basis, but it did not report specific lengths of fingerlings purchased.[26]   See

Supplemental Section D Questionnaire Response – An Giang Fisheries Import and

Export Joint Stock Company at Ex. 2, PD 143, bar code 3199492-01 (May 2, 2014)

("Agifish Suppl. Sec. D. Questionnaire Resp.").   Commerce concluded that the number of

fingerlings per kilogram declines exponentially as fingerlings grow larger (i.e., longer as

measured from snout to tail fin).   Final Decision Memo at 31.   It is reasonably discernible

that Commerce concluded that fingerling size affects the price of a kilogram of

fingerlings.[27]   See id.   Therefore, because HVG did not report the lengths of fingerlings

purchased, Commerce reasonably used data on the record to obtain size-specific pricing.

Agifish speculates that something must be wrong with the conversion factor used

to calculate the number of fingerlings of a given size are in a kilogram of fingerlings

contained in the Rukmono Affidavit because the ranges of prices stated on a per-kilogram

basis are too wide to be accurate.   Agifish Br. 18, Ex.1.   However, Agifish cites no record

---

[26] Agifish argues that HVG did report fingerling lengths in its supplemental questionnaire response.   See Agifish Br. 50–51.   However, Commerce rejected the size data reported by Agifish as untimely new factual information.   See Letter to HVG Rejection of New Factual Information, PD 226, bar code 3208247-01 (June 11, 2014).   Separately, Agifish argues Commerce's rejection of this data was an abuse of discretion.   See id. 50–52.   The court addresses this challenge separately.

[27] Lacking fingerling length information from HVG, Commerce used the Rukmono Affidavit to convert the number of fingerlings per kilogram HVG reported purchasing to a specific length.   See Memorandum re: Surrogate Values for the Preliminary Results at 3, PD 238, bar code 3213863-01 (July 2, 2014) ("Prelim. SV Memo"); see also Memorandum re: Surrogate Values for the Final Results at Ex. 4, PD 298, bar code 3251319-01 (Jan. 7, 2015) ("Final SV Memo").   Commerce then obtained a size-specific price for HVG's fingerlings on a per piece basis from a chart included in the Rukmono Affidavit.   See Prelim. SV Memo at 3; see also Final SV Memo at Ex. 4.   Lastly, because HVG reported its fingerling purchases in price per kilogram, Commerce converted the size-specific per-piece price to a per-kilogram price using the pieces per kilogram conversion factor contained in the Rukmono Affidavit.   See Prelim. SV Memo at 3; see also Final SV Memo at Ex. 4.

evidence indicating that the fingerling pricing contained in the Rukmono Affidavit is aberrational compared to other SV data on the record.  In fact, Commerce noted that the conversion ratio in the Rukmono Affidavit is nearly identical to that in another affidavit from Mr. Coco Soetrisno, an official in the same Indonesian ministry.  Final Decision Memo at 32.  Commerce further noted that the conversion ratio used in both affidavits is promulgated by an official government entity, the National Standardization Agency of Indonesia.[28] Id.  The mere fact that the Rukmono Affidavit contains a wide range of prices of fingerlings, without some other reliable record data that is at odds with such a wide range of prices for fingerlings, is insufficient to render Commerce's determination unreasonable.  Therefore, Commerce reasonably determined that the fingerling pricing in the Rukmono Affidavit is reliable and non-aberrational.

Agifish also argues that Commerce's conversion from a per-piece price to a per-kilogram price is unnecessary.  Agifish Br. 22–23.  Agifish argues Commerce could have avoided the piece-per-kilogram conversion altogether had it simply used HVG's fingerling FOP consumption data to  determine the number of pieces HVG used and then used per piece pricing data on the record. Id. at 22; see also Agifish Suppl. Sec. D. Questionnaire

---

[28] Agifish argues that there must be an error in the conversion factor used in the Rukmono Affidavit because the Rukmono Affidavit generates a per kilogram price for 4.0–5.0 inch fingerlings that is 412% larger than the price range for the same size fingerlings in the Soetrisno affidavit.  Agifish Br. 19.  Agifish presents no other benchmark data to measure the per-kilogram prices against.  Moreover, Agifish presents no evidence that this inconsistency in per kilogram pricing affects the 5.0–6.0 inch fingerling size range of the Rukmono Affidavit that Commerce actually used to calculate a SV for HVG's fingerlings.  See Memorandum re: Surrogate Values for the Final Results at Ex. 4, PD 298, bar code 3251319-01 (Jan. 7, 2015).  Since the conversion ratio is otherwise corroborated between the Rukmono and Soetrisno affidavits and the ratio is promulgated by an official Indonesian agency, the court cannot say Commerce unreasonably concluded that the fingerling pricing in the Rukmono Affidavit is not aberrational.

Resp. at Ex. 2.  Even if Agifish were proposing a reasonable alternative methodology, it would not render Commerce's conversion of the per-piece pricing in the Rukmono Affidavit to per-kilogram pricing to match Respondent's reported consumption data unreasonable or unsupported by the record.  Agifish points to no alternative benchmark indicating that the conversion factor used by Commerce resulted in aberrational fingerling values.  Moreover, Commerce reasonably determined that it could not use HVG's reported data to obtain a per-piece to per-kilogram conversion because Commerce found HVG's conversion factor to be unreliable.[29]  Final Decision Memo at 31.  Therefore, Commerce reasonably determined the conversion factor used in the Rukmono Affidavit is necessary and also the best available information for obtaining size-specific fingerling SV data.

Lastly, Agifish argues that Commerce lacked substantial evidence to use the 5.0–6.0 inch size band for HVG's fingerlings because the record is devoid of fingerling length information.  Agifish Br. 21.  However, Defendant points out that Commerce derived fingerling length information from HVG's reported number of pieces per kilogram.[30]  Def.'s

---

[29] Commerce highlighted that HVG 's reported fingerling consumption was internally contradictory because it reported that it consumed varying amounts of fingerlings per kilogram, but that the size of its fish did not vary.  Final Decision Memo at 32.  Commerce found that this data conflicted with other record evidence indicating that as fingerlings increase in size the number of fingerlings per kilogram declines exponentially.  Id. at 31.

[30] Defendant explains that Commerce matched respondent's reported "pieces per kilogram" purchases, see Agifish Suppl. Sec. D. Questionnaire Resp. at Ex. 2, to the information in the Rukmono Affidavit listing the number of pieces-per-kilogram for each size band.  Def.'s Resp. Br. 42.  It is reasonably discernible that this cross-referencing of sources allowed Commerce to convert pieces-per-kilogram to a corresponding size band in the Rukmono Affidavit for its final results, just as Commerce had done in its preliminary results.  Def.'s Resp. Br. 42–43 (citing Memorandum re: Surrogate Values for the Preliminary Results at 3, PD 238, bar code 3213863-01 (July 2, 2014)).

Resp. Br. 42. Therefore, the 5.0-6.0 inch length derived by Commerce is based upon information in the record even though respondent did not report fingerling length directly. Agifish points to no evidence that this methodology results in aberrational fingerling SVs.

### 2. Commerce's Application of a Yield Loss Ratio

Agifish argues Commerce's application of a yield loss ratio to HVG's fingerling consumption is not supported by substantial evidence because the record demonstrates respondent's reported FOP consumption already reflects yield losses captured during an 18–25 day warranty period. Agifish Br. 24. Defendant responds Commerce reasonably adjusted the ratio of fingerlings consumed by HVG to ensure an accurate fingerling usage by ensuring that the usage ratio was calculated on a consistent basis. Def.'s Resp. Br. 43.

Commerce reasonably applied a yield loss ratio to convert HVG's fingerling consumption ratio because substantial evidence indicates that HVG reported its fingerling usage net of yield losses (i.e., fingerlings that died during the warranty period), but nothing indicates the pricing on the record reflects pricing net of yield losses.[31] See Final Decision

---

[31] Although Commerce did not fully explain why adjusting HVG's usage ratio upward was necessary to ensure a consistent ratio, its rationale is reasonably discernible from Commerce's statement that the adjustment was necessary "[i]n order to capture the actual amount of fingerlings consumed by HVG." See Final Decision Memo at 34. Commerce cited its practice of adjusting the margin calculation for yield losses in order to accurately capture FOPs consumed throughout the production of subject merchandise. Final Decision Memo at 34 (citing Issues and Decision Memorandum for the Administrative Review and New Shipper Reviews of the Antidumping Duty Order on Fresh Garlic from the People's Republic of China at 85–90, A-570-831, (May 4, 2006), available at http://ia.ita.doc.gov/frn/summary/prc/E6-6759-1.pdf (last visited Jan. 18, 2017). It is reasonably discernible that ensuring that both the numerator and denominator of the usage ratio is stated on a consistent basis is necessary to ensure accuracy. It follows that

(footnote continued)

Memo at 34; <u>see also</u> Petitioners Surrogate Value Data at Ex. 16-B, PD 176–182, bar codes 3200753-01–07 (May 12, 2014) (containing the Rukmono Affidavit).  Commerce found that HVG subtracted the number of fingerlings that died during an 18-25 day warranty period from its reported FOP consumption.  Final Decision Memo at 33. Therefore, Commerce reasonably concluded that both the numerator and the denominator of HVG's usage ratio needed to reflect gross quantities so that the SV of this input could be calculated accurately and on the same basis.  Agifish contends that this adjustment was unnecessary because HVG reported the quantity of fingerlings for which the company paid its supplier.  Agifish Br. 24.  Whether or not HVG properly reported merchandise it did not pay for in the relatively short warranty stage, <u>see</u> Agifish Case Brief at Ex. 2, PD 265, bar code 3229990-01 (Sept. 19, 2016) ("Agifish Case Br."), is irrelevant to whether Commerce may reasonably adjust fingerling consumption to ensure an accurate usage ratio.  Agifish offers no record evidence indicating that the SV data in the Rukmono Affidavit is net of yield loss, as HVG reported its FOP consumption.  Therefore, Commerce reasonably adjusted HVG's fingerling consumption to ensure the ratio is calculated on a consistent basis.

### D.  Packing Tape

Agifish challenges Commerce's decision to value respondents' packing tape input using Indonesian import data under HTS subcategory 3919.10 as not specific and

---

Commerce implicitly concluded that the pricing data on the record did not reflect prices net of yield losses, and Agifish does not suggest otherwise.  Commerce reasonably adjusted the numerator of the usage ratio to include all fingerlings purchased because the denominator of the usage ratio contained pricing that is not net of yield losses.

aberrational.   Agifish Br. 25–27.   The court finds Commerce's selection of Indonesian

import data to value respondents' packing tape FOP is supported by substantial evidence.

Commerce found that Indonesian import data under HTS 3919.10, which covers

"Plates, Sheets, Film, Foil, Tape and Other Flat Shapes of Plastics, Self-adhesive, In

Rolls Not Over 20 cm (8 In.) Wide," satisfies the full breath of its SV data selection criteria.

Final Decision Memo at 54.   Commerce concluded that the import data does not contain

aberrational data because the SVs derived from other economically comparable countries

on the record is approximately half that of the SV based upon Indonesian data.   Id.

Commerce concluded this difference is "not so large as to demonstrate a strong flaw with

current POR's data for HTS 3919.10 consistent with aberrational data."[32]   Id.   The court

cannot say that Commerce's conclusion is unreasonable.

Commerce reasonably concluded that Indonesian import data is better relative to

Foreign Trade Statistics of Bangladesh because the latter source is not contemporaneous

because it covers the period from July 2009 to June 2010.   Id.   Moreover, Commerce

concluded that the Bangladeshi Foreign Trade Statistics are not reliable because

respondents only placed a portion of this publication on the record and Commerce was

unable to determine from that excerpt that the data is reliable.   Id.   Commerce likewise

concluded that Indonesian price quotes are not representative of a broad market average,

not contemporaneous, and do not indicate that they are exclusive of taxes and duties.   Id.

---

[32] Commerce did acknowledge that it removed 2,365 kilograms of Swiss imports for which the average unit value is $1,802.62 per kilogram as aberrational relative to the SV of $20.59 per kilogram otherwise calculated from import data for respondent's packing tape.   Final Decision Memo at 54; see also Memorandum re: Surrogate Values for the Final Results at 2, PD 287, bar code 3251319-01 (Jan. 7, 2015).

at 55.  Commerce also concluded that it could not consider the Indonesian price quotes as SV data sources because they were submitted in respondents' SV rebuttal submission and its regulations do not allow using information from rebuttal submissions to be used as SV data.  Id. (citing 19 C.F.R. § 351.301(c)(3)(iv)).  Lastly, Commerce determined that it would not consider the import data from other economically comparable countries because the record contains suitable import data from the primary surrogate country.  Id. Commerce reasonably determined that Indonesian data satisfied the full breadth of its SV data selection criteria and is non-aberrational.   Therefore, Commerce's selection of Indonesian data as the best available information is supported by substantial evidence.

Agifish argues that the SV data from Indonesian imports is not specific and must be aberrational because the average unit values ("AUVs") in the import data range from $0.56 per kilogram from Myanmar up to $52 per kilogram from Pakistan and Iceland. Agifish Br. 25–26.  Agifish speculates that such a wide range of prices could only result if the category contains products other than packing tape that were imported into Indonesia under HTS 3919.10 during the POR.  Id. at 26.  The wide range of AUVs referenced by Agifish does not undermine Commerce's conclusion that Indonesian import data is specific and non-aberrational because the high-value imports reflect small volumes relative to the total volume of imports.  See Agifish Br. at Ex. 2.  Based on the record here, Commerce reasonably determined the volume of high priced imports is insufficient to demonstrate that Indonesian import data significantly consisted of non-specific merchandise whose prices differed significantly from the packing tape used by

respondents.[33]  Therefore, Commerce reasonably determined the Indonesian import data

is specific and non-aberrational.

### E.  Packing Strap

Agifish argues Commerce lacked substantial evidence to conclude that Indonesian

import data under HTS 3920.30 is specific to packing strap and does not result in an

aberrationally high value for this input.   Agifish Br. 27–28.   For similar reasons as for

packing tape, the court concludes Commerce reasonably determined Indonesian import

data is the best available information on the record to value respondent's packing strap.

Commerce found that Indonesian import data under HTS 3920.30, which covers

"Other plates, sheets, film, foil, and strips of plastic, non-cellular and not reinforced,

laminated, supported or combined with other materials or Polymers of Styrene," satisfies

the full breath of its SV data selection criteria, and it noted no party disputes these

findings.  Final Decision Memo at 56–57.  Commerce concluded that the import data does

not contain aberrational data because the SVs derived from other economically

comparable countries on the record are approximately one third that of the SV based

upon Indonesian import data.   Id.   Commerce concluded this difference is not large

enough to demonstrate the data is aberrational.   Id.   The court will not reweigh the

---

[33] As evidence detracting from Commerce's finding that Indonesian imports under HTS 3919.10 are specific, Agifish cites imports from Pakistan and Iceland into Indonesia, which it argues had AUVs of $61.75 per kilogram and $62.00, respectively.  Agifish Br. 26 (citing id. at Ex. 2).  The imports highlighted by Agifish together represent a mere 13 kilograms of 3,657,560 kilograms of total imports into Indonesia during the POR.  See Agifish Br. at Ex. 2.  It is, therefore, reasonably discernible that Commerce concluded that it could not conclude data is non-specific or aberrational where such a small proportion of imports were likely too expensive to be packing tape.

evidence, and on this record the court cannot say that Commerce's conclusion is unreasonable.

Commerce reasonably concluded that Indonesian import data is the best available information relative to Foreign Trade Statistics of Bangladesh and the Indonesian price quotes on the record for the same reasons it did so for packing tape.  Id. at 57–58.  Commerce also declined to consider import data on the record from other economically comparable countries because the record contains suitable import data from the primary surrogate country.  Id. at 58.  Commerce reasonably determined that Indonesian data to value packing strap satisfies the full breadth of its SV data selection criteria and is non-aberrational.  Therefore, Commerce's selection of Indonesian import data to value packing strap is supported by substantial evidence.

Agifish argues that the SV data from Indonesian imports under HTS 3920.30 cannot be representative of packing strap because the AUV range from $0.86 per kilogram from Turkey up to $42.61 per kilogram from the United States is too wide and must contain other higher value-added merchandise.  Agifish Br. 28.  Just as for packing tape, it is reasonably discernible that Commerce concluded the volume of high priced Indonesian imports under this HTS subcategory is insufficient to conclude the import data significantly consisted of non-specific merchandise whose prices differed significantly from the packing strap used by respondents.[34]

---

[34] Agifish cites imports to Indonesia from the United States under HTS 3920.30 with AUVs of $42.61 per kilogram as detracting from Commerce's finding that the imports are specific to

(footnote continued)

**PUBLIC VERSION**

### F. Fish Waste Byproducts

Agifish challenges Commerce's selection of an average of price quotes from two Philippine pangasius processors, Vitarich Corporation ("Vitarich") and Bluebay Aquaculture Inc. ("Bluebay") to value respondent's fish waste byproducts, including fish waste, fish belly, fish stomach, fish head, fish fat, and fish skin, as unreliable, not publicly available, not tax and duty exclusive, and not representative of a broad market average. Agifish Br. 29–39. Defendant argues that Commerce reasonably found the Vitarich and Bluebay price quotes are more reliable and specific than Indonesian import data for various categories of respondent's fish waste byproducts. Def.'s Resp. Br. 50. Agifish's arguments are unpersuasive, and Commerce's selection of Philippine price quotes to value various fish waste byproducts is reasonable.

Commerce concluded that the Vitarich and Bluebay price quotes are specific because, together, they cover the full range of byproducts sold by respondents.[35] Final Decision Memo at 80. Commerce found the superior specificity of the price quotes render

---

packing tape. Agifish Br. 28 (citing id. at Ex. 3). These imports represent 1,908 kilograms out of 896,405 kilograms of total imports into Indonesia during the POR. See Agifish Br. at Ex. 3. It is, therefore, reasonably discernible that Commerce concluded the import data is not aberrational where a relatively small proportion of imports were likely too expensive to be packing strap.

[35] Commerce noted the Vitarich price quote contains prices for head and belly waste, bone and tails waste, skin, and trimmings, which are sold by HVG. Final Decision Memo at 80 (citing Petitioners' Surrogate Country Comments and Submission of Proposed Factor Values at Ex. 38, PD 176–182, bar codes 3200753-01–07 (May 12, 2014)); see also Section D Questionnaire Response – An Giang Fisheries Import and Export Joint Stock Company at 31–34, CD 65, bar code 3182100-01 (Feb. 18, 2014). According to Commerce, the Bluebay price quote covers fish trimmings, head and tail bones, and pangasius skin. Final Decision Memo at 80 (citing Petitioners' Surrogate Country Comments and Submission of Proposed Factor Values at Ex. 38, PD 176–182, bar codes 3200753-01–07 (May 12, 2014)); see also Section D Questionnaire Response – An Giang Fisheries Import and Export Joint Stock Company at 31–34, CD 65, bar code 3182100-01 (Feb. 18, 2014).

them the best available information to value respondent's fish waste byproducts because the Indonesian import data is overly broad and contains products other than the fish waste products sold by HVG. Id. at 81. Commerce considered the record evidence indicating respondents were unable to reproduce the price quotes despite several attempts to contact Vitarich and Bluebay directly and acknowledges that it undermines the public availability of the price quote. Id. Nonetheless, Commerce reasonably considered the price quotes reliable because the affidavits accompanying them indicate the circumstances of how the price quotes were obtained. Id. Commerce also noted that the price quotes are not representative of a broad market average and that the Vitarich price quote is not contemporaneous, but reasonably concluded both sources are tax and duty free because the quotes contain all the information to demonstrate they are ex-factory and tax exclusive.[36] Id.

Commerce concluded that Indonesian import data under HTS 0511.91.0090 is not specific because the subcategory, which includes "Animal products not elsewhere specified or included; dead animals of Chapter 1 or 3, unfit for human [c]onsumption;

[36] Agifish argues that it is not clear from the record whether the 2013 Vitarich price quote is exclusive of transportation costs. Agifish Br. 37–38. Specifically, Agifish argues that the absence of this information undermines its reliability because a company would not be willing to sell byproducts for the same price with or without transportation. Id. at 37. However, Agifish cites no record evidence to support its suspicion that a fish processor would not sell such byproducts at the same price regardless of whether it is delivered or an ex-factory price. Commerce notes that initially the price quote was silent on delivery terms and a later affidavit indicated that the "delivered" and "pick-up" prices were identical. Final Decision Memo at 76 n. 584. Commerce also notes that "[a] revised price quote states the prices were delivered prices." Id. It is reasonably discernible that Commerce weighed this record evidence and determined that it did not undermine the fact that the price quote is tax and duty exclusive. The court declines to reweigh the evidence. On this record, Commerce's determination is reasonable.

[p]roducts of fish or crustaceans, molluscs or other aquatic invertebrates; dead animals of Chapter 3; other," by its terms is overly broad in that it contains items other than the fish waste byproducts consumed by respondents.[37]  Id. at 81–82.  Likewise, Commerce concluded Indonesian import data under HTS 0511.9140 is not the best available information to value respondent's fish skin byproduct because no such import data is on the record in this review.[38]  Id.  Finally, Commerce determined Indonesian import data under HTS 0304.32 is not specific to value fish belly/meat because the HTS subcategory, which includes "Fish fillets and other fish meat (whether or not minced), fresh, chilled or frozen; Catfish (Pangasius spp., Silurus spp., Clarias spp., Ietalurus spp.))," by its terms includes whole, unbroken frozen and fresh fish fillets.  Id.  Commerce noted that HVG reported producing and selling fish belly/meat as a waste by-product "derived from the

---

[37] Agifish argues that Commerce's finding that the Indonesian import data is not specific is belied by its finding in the seventh administrative review.  Agifish Br. 40–43.  However, in that review, Commerce did not find the Indonesian import data to be perfectly specific, but rather, found it more specific relative to other data on the record and import data better satisfied its data selection criteria.  See Certain Frozen Fish Fillets From the Socialist Republic of Vietnam, 77 Fed. Reg. 15,039 (Dep't Commerce Mar. 14, 2012) (final results and partial rescission of the seventh AD administrative review) and accompanying Certain Frozen Fish Fillets from the Socialist Republic of Vietnam ("Vietnam"): Issues and Decision Memorandum for the Final Results of the Seventh Antidumping Duty Administrative Review at 18, A-552-801, (Mar. 7, 2012), available at http://ia.ita.doc.gov/frn/summary/vietnam/2012-6201-1.pdf (last visited Jan. 18, 2017).  Commerce's determination that the price quotes is the best available information to value waste byproducts is supported by substantial evidence even if Indonesian import data is somewhat specific.

[38] Commerce referenced that HVG "purported to place data for HTS 0511.91.0040 on the record to value fish skin," but concluded the data is absent.  Final Decision Memo at 82 (citing An Giang Fisheries Import and Export Joint Stock Company – Direct Surrogate Values at Ex. 30, PD 158–160, bar codes 3201162-01–05 (May 12, 2014)).  Agifish does not contradict Commerce's finding as to the absence of this data on the record nor does it provide a citation to the record to demonstrate where on the record this import data appears.

trimmings stage," which Commerce reasonably concluded does not include whole fish

fillets.  Id.

Commerce reasonably concluded that the Philippine price quotes are superior to

other price quotes on the record because of their superior specificity.  Commerce

concluded that the price quote from Bangladeshi company Asian Seafoods, Inc. ("Asian

Seafoods") is not as specific as those from Vitarich and Bluebay because the former does

not contain individualized prices for specific fish waste byproducts whereas those of

Vitarich and Bluebay quotes do.  Id. at 82.  In addition, Commerce noted that the record

does not indicate whether the Asian Seafoods quote contains prices on a tax and duty-

exclusive basis.  Id.  The record reasonably supports Commerce's determination.

Agifish argues that Commerce lacked substantial evidence to conclude the Vitarich

and Bluebay price quotes are reliable market prices generated in the normal course of

business and publicly available because the quotes could not be replicated despite

respondents' repeated efforts to contact the companies.[39]  Agifish Br. 31.  Agifish's claims

that the record lacks evidence supporting the reliability of Philippine price quotes are

unfounded because its objections are based upon speculation as to the circumstances in

which the price quotes were given.[40]  Here, Commerce had competing affidavits on the

---

[39] Agifish supports its claims by citing numerous affidavits detailing unsuccessful efforts undertaken by various parties engaged by respondents to replicate the Vitarich and Bluebay price quotes.  See Agifish Br. 31–35.

[40] Commerce notes that the Vitarich and Bluebay price quotes are accompanied by affidavits detailing the circumstances of how they were obtained, the terms of the pricing, and specifically what products are included in the quote.  Final Decision Memo at 81.  Commerce did not ignore

(footnote continued)

record.  An assessment of credibility and reliability of data cannot be reduced to simple

arithmetic.  Although several affidavits claim the Philippine companies did not respond to

price inquiries weighs against their reliability, the court cannot say Commerce

unreasonably determined the Philippine price quote is reliable where the quotes are

accompanied by an affidavit attesting to its reliability.

Moreover, Commerce reasonably determined that any doubts as to the reliability

of the Vitarich and Bluebay price quotes are outweighed by their superior specificity

relative to other data sources as well as their public availability and tax and duty

exclusivity.  Final Decision Memo at 81.  None of the affidavits submitted by respondent

detailing efforts to reproduce the price quotes actually questions the accuracy of the

pricing information in the Vitarich or Bluebay affidavits or offers pricing that differs from

the Philippine price quotes.  <u>See</u> Petitioners' Surrogate Country Comments and

Submission of Proposed Factor Values at Ex. 38, PD 176–182, bar codes 3200753-01–

07 (May 12, 2014) ("CFA Surrogate Country Comments").  Agifish's arguments appear to

call into question the public availability of the Philippine price quotes more than their

---

the affidavits, but reasonably credited other record information indicating the Philippine quotes
are reliable.  <u>Id.</u>  Commerce preferred the Philippine price quotes despite evidence that
respondents could not replicate them because of their superior specificity. <u>Id.</u>  The court cannot
say that Commerce unreasonably discounted the fact that the price quotes were obtained by a
lawyer.  Nor is it unreasonable for Commerce to conclude that an affidavit obtained by a lawyer
is reflective of pricing available in the ordinary course of business where the affidavit indicates it
is. Although the number of efforts undertaken by the persons retained by respondents to replicate
the quote should factor in assessing the reliability of the price quotes, Commerce did consider
this record evidence, and it reasonably determined that the weight of this evidence is insufficient
to render the price quotes unreliable.

reliability.  The court cannot say that Commerce unreasonably considered the superior

specificity of these price quotes to outweigh their lack of public availability.

Agifish also argues that Commerce lacked substantial evidence to conclude that

the Vitarich and Bluebay price quotes are the best available information to value

respondents' fish waste byproducts because they are not from the primary surrogate

country.  Agifish Br. 36.  However, Commerce's reasonably concluded that Indonesian

data is not specific because the HTS subcategories are overly broad to the byproducts

produced by respondents.  Nothing in the statute or in Commerce's practice requires

Commerce to select data from a primary surrogate country where it concludes such data

is not the best available information to value respondent's FOPs.  See 19 U.S.C. §

1677b(c)(1).  Agifish points to no record evidence showing it is unreasonable for

Commerce to conclude that more specific data from the Philippines is superior to

Indonesian data where the record lacks specific pricing data from Indonesia.

### G. Brokerage and Handling Expenses

Agifish challenges Commerce's selection of the World Bank's "Doing Business

2014: Indonesia" report to value respondent's brokerage and handling because the report

is not specific to prices for brokerage and handling of pangasius fillets.  See Agifish Br.

46–48.  Defendant responds that Commerce's selection is reasonable.  See Def.'s Resp.

Br. 56–57.  The court agrees with Defendant.

Commerce found that the "Doing Business 2014: Indonesia" satisfies the full

breadth of its SV data selection criteria.  Final Decision Memo at 69.  Commerce found

Doing Business Indonesia is specific because the report "lists all charges associated with

exporting a product overseas – document preparation, customs clearance, and port and terminal handling – charges that would be included in brokerage handling. Id. at 69. Commerce acknowledged that the price quote issued by Indonesian company PT Jayantara Setia Sejahtera ("Jayantara") is arguably more specific, but it found the price quote does not meet any of the other SV criteria. Id. at 70. Commerce also noted that it does not choose price quotes where a broad market average source is available that meets its SV data selection criteria. Id. Commerce reasonably preferred the Indonesian "Doing Business" report to the same report from Bangladesh because it is from the primary surrogate country. Id. at 70.

Agifish questions the specificity of the Doing Business report because it does not reflect brokerage and handling prices specific to the pangasius industry. Agifish Br. 47. However, Agifish points to no record evidence that brokerage and handling expenses in the pangasius industry differ significantly from general brokerage and handling. In light of the fact the Doing Business report satisfies the balance of Commerce's SV data selection criteria, Final Decision Memo at 64, Commerce's SV data selection is reasonable despite the fact it may not reflect data specific to the pangasius industry.

### H. Truck Freight

Agifish raises precisely the same specificity objections with regard to Commerce's selection of the World Bank's "Doing Business 2014: Indonesia" source to value respondents' truck freight FOP as it raises regarding the use of the same source to value brokerage and handling. See Agifish Br. 43–44. For the same reasons, Commerce

reasonably selected the Doing Business Report as the best available information to value

truck freight.

Commerce reasonably selected the Indonesia Doing Business Report as the best

available information to value respondents' truck freight because the Doing Business

Indonesia report satisfies the breadth of its SV data selection criteria, including specificity.

Final Decision Memo at 67.  Commerce acknowledged that the Doing Business report

reflects inland freight whereas the Jayantara price quote covers prices specific to the

exportation of pangasius fillets.  Id.  Commerce noted that the Doing Business source

contains prices for inland freight incurred in the consumption of FOPs but lacks data for

freight used in the exportation of pangasius fillets whereas the Jayantara price quote had

data for exportation of pangasius but lacked inland freight for consumption of FOPs.  Id.

As neither quote contained freight pricing for all relevant freight used by respondent,

Commerce reasonably concluded that neither data source is more specific than the other.

Id.

Commerce concluded that the Jayantara price quote is not the best available

information because it is from a secondary source and not representative of a broad

market average.  Id.  Finally, Commerce found that the Bangladeshi Statistics Yearbook

data on the record is not contemporaneous and no more specific than Doing Business

Indonesia because it covers general freight whereas Doing Business Indonesia covers

inland freight.  Id.  Therefore, Commerce reasonably determined that the Doing Business

Report best satisfied its SV data selection criteria.

Agifish argues Commerce unreasonably determined the Indonesia Doing Business report is specific because the report does not cover the key inputs used in the pangasius industry.  Agifish Br. 44.  The court disagrees.  Agifish points to no record evidence that transporting the inputs used in the pangasius industry significantly differ from those used in transporting inputs used in other industries.  Therefore, Commerce reasonably concluded that the Doing Business report contains specific pricing for respondent's freight FOP.

### I.  Fish Feed

Agifish challenges Commerce's determination to value respondents' fish feed using prices in the Rukmono Affidavit because the prices are not representative of a broad market average and not contemporaneous.  Agifish Br. 54.  Defendant argues that Commerce reasonably concluded the Rukmono Affidavit is the best available information to value respondents' fish feed because it is the most specific source in that it specifies the protein content of the feed and the size of the feed pellets.  Def.'s Resp. Br. 58–59. The court remands Commerce's determination because Commerce has failed to explain why its selection of different SV data in this review versus the ninth administrative review is reasonable despite identical data on the record.  Here, Commerce favored the Rukmono Affidavit primarily because it is the most specific data on the record in that it specifies the protein content and size of pangasius feed pellets whereas the article from the Trobos Aqua publication does not.  Final Decision Memo at 40.  Although it may be reasonable for Commerce to decide that the most specific data on the record is the best available information to value fish feed, Commerce has not explained why it is reasonable

to reach opposite conclusions on whether the same Rukmono Affidavit was representative of a broad market average in this review versus those reached in the ninth administrative review. On remand, Commerce must address this issue or reconsider its determination.

Pursuant to Section 2641 of the Customs Court Act of 1980, as amended, 28 U.S.C. § 2641(a), and Rule 201 of the Federal Rules of Evidence, the court takes judicial notice of Commerce's final determination in its ninth administrative review under the order concerning certain frozen fish fillets from the Socialist Republic of Vietnam. See 28 U.S.C. § 2641(a) (providing that the Federal Rules of Evidence shall apply to all civil actions before the Court); Fed. R. Evid 201.[41]   In the ninth administrative review, Commerce determined the very same article from Trobos Aqua was the best available information over the Rukmono Affidavit despite the fact that the Rukmono Affidavit was more specific in that it specified protein content of pangasius feed. See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Issues and Decision Memorandum for the Final Results of the Ninth Administrative Review and Aligned New Shipper Review at 34, A-552-801, (Mar. 28, 2014), available at http://ia.ita.doc.gov/frn/summary/vietnam/2014-07714-1.pdf (last visited Jan. 18, 2017) ("Ninth AR Final Decision Memo"). In reaching its determination in the ninth review,

---

[41] Rule 201 of the Federal Rules of Evidence permits a court, on its own and at any stage of the proceeding, to take judicial notice of a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b)–(d). The court takes judicial notice only of the contents of Commerce's final determination, not its substance, the accuracy of which cannot reasonably be questioned because the determination is published and publicly available.

Commerce relied in part on its conclusion that the Rukmono Affidavit was not representative of a broad market average because it contained only pricing data from one month (i.e., January 2014).  See id.

In this review, Commerce determined that the same Rukmono Affidavit, which was also placed on the record in this review, is representative of a broad market average, see Final Decision Memo at 39, because it determined that the fact that the Rukmono Affidavit is from only one month (i.e., January 2014) is offset by the fact that the data covers regions producing the vast majority of Indonesia's pangasius.[42]  Id.  However, the fact that pricing data represents a wide range of regions accounting for the vast majority of pangasius production cannot explain why the lack of temporal coverage is insignificant.  This gap in logic is particularly glaring where Commerce determined that the same source, with identical regional and temporal coverage, was not representative of a broad market average in the immediately preceding review.  See Ninth AR Final Decision Memo at 34.  Commerce did not explain what about the record evidence in this review, which

---

[42] At oral argument, Defendant noted that, based upon the data presented by Commerce in its preliminary surrogate value memorandum reflecting total pangasius production in Indonesia, the largest three pangasius producing districts in Indonesia account for approximately 99.8% of the total pangasius production in Indonesia.  Oral Argument at 00:50:36–00:50:43, Dec. 8, 2016, ECF No. 120 (citing Tenth Administrative Review of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Surrogate Values for the Preliminary Results at Ex. 3, PD 238 (bar code 3213863-01 (July 2, 2014)).  However, there is no indication that Commerce relied upon this specific figure to make its determination, nor does the document referenced by Defendant list the percentage of total production represented by pangasius production in these districts.  See Final Decision Memo at 39; Memorandum re: Surrogate Values for the Preliminary Results at Ex. 3, PD 238 (bar code 3213863-01 (July 2, 2014).  Moreover, because the same SV documents were being considered in the ninth review, see Ninth AR Final Decision Memo at 34–35, Defendant pointed to nothing on the record indicating that the share of production covered by the Rukmono Affidavit changed since that review.

was the same as in the last review, justified its change of course.  On remand it must do

so.

## III.    Commerce's Rejection of Fingerling Length Information

Agifish argues that Commerce abused its discretion by rejecting fingerling length

data submitted on May 22, 2014 supplementing Agifish's May 2, 2016 submission as

"unrequested" new factual information because Commerce's original April 14, 2014

questionnaire requested fingerling size data.  Agifish Br. 52; <u>see also</u> Commerce Letter

to HVG re: Rejection of New Factual Information at 1, PD 226, bar code 3208247-01

(June 11, 2014) ("Rejection of New Factual Info.").  In the alternative, Agifish argues that

Commerce abused its discretion by rejecting fingerling length information because that

information would have enhanced its margin calculations.  <u>Id.</u>  Defendant responds that

Commerce acted in accordance with law because Commerce's supplemental

questionnaire did not request length information.  Def.'s Resp. Br. 60 (citing Letter from

Commerce to HVG re: Supplemental Section D Questionnaire at Att. 1, PD 147, bar code

3200447-01 (May 8, 2014) ("Suppl. Sec. D. Quest.")).  Defendant also counters that

Commerce reasonably rejected the length information in Agifish's May 22, 2014

submission questionnaire response because it was not timely filed in response to

Commerce's original questionnaire requesting size information.  <u>Id.</u>

"Absent constitutional constraints or extremely compelling circumstances the

administrative agencies should be free to fashion their own rules of procedure and to

pursue methods of inquiry capable of permitting them to discharge their multitudinous

duties."  <u>Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.</u>, 435 U.S. 519,

543–44 (1978) (internal quotations omitted).  Normally, courts will defer to the judgement of an agency regarding the development of the agency record.  See PSC VSMPO-AVISMA Corp. v. United States, 688 F.3d 751, 760 (Fed. Cir. 2012) (citing Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp., 423 U.S. 326, 333 (1976) (a reviewing court may not dictate to the agency the methods, procedure and time dimensions of a necessary inquiry without substantial justification)).  "In addition, '[i]n order for Commerce to fulfill its mandate to administer the antidumping duty law, including its obligation to calculate accurate dumping margins, it must be permitted to enforce the time frame provided in its regulations.'"  Dongtai Peak Honey Indus. Co. v. United States, 777 F.3d 1343, 1351 (Fed. Cir. 2015) (quoting Yantai Timken Co. v. United States, 31 CIT 1741, 1755, 521 F. Supp. 2d 1356, 1371 (2007)).

Commerce's regulations specify deadlines for the submission of factual information.  See 19 C.F.R. § 351.301.  Initial questionnaire responses "are due 30 days from the date of receipt of such questionnaire."  19 C.F.R. § 351.301(c)(1)(i).  Generally, a questionnaire is considered received "seven days from the date on which the initial questionnaire was transmitted."  Id.  Unless Commerce has extended the time to submit factual information, Commerce will not consider in the official record of the proceeding untimely filed factual information.  19 C.F.R. § 351.302(d)(1)(i).  When Commerce rejects factual information as untimely, it will not use such factual information in making any determination, nor will the official record include the filed document containing such factual information except for the sole purpose of "documenting the basis for rejecting the document."  19 C.F.R. § 351.104(a)(2)(i).

Commerce adequately supported its decision to reject HVG's new factual information submitted on May 22, 2014 as untimely by underscoring that "HVG had an opportunity to submit additional information regarding fingerling length in response to [its] April 15 supplemental questionnaire."[43]   Final Decision Memo at 35 (citing 19 C.F.R. § 351.302(d)(1)(i)).   Commerce explained that, rather than doing so, HVG submitted the information on May 22, 2014, in response to a subsequent questionnaire that requested only clarification of limited information.[44]   See Final Decision Memo at 35 (citing 19 C.F.R. § 351.302(d)(1)(i)).

---

[43] On April 14, 2014, Commerce issued a supplemental questionnaire to respondent HVG asking that it "provide the size of fingerlings purchased at each of HVG's farms and provide invoices which support [its] answer."  See Letter from Commerce to HVG re: Supplemental Section A, C, D Questionnaire, PD 135, bar code 3195672-01 (Apr. 14, 2014).  On May 2, 2014, HVG submitted a response consisting of a fingerling purchase chart, invoices, and contracts.  See Supplemental Section D Questionnaire Response – An Giang Fisheries Import and Export Joint Stock Company at Exs. 1–2, PD 143, bar code 3199492-01 (May 2, 2014).  Agifish argues that this response provided size information for HVG's fingerling purchases in terms of number of pieces per kilogram.  See Agifish Br. 51.  Agifish does not argue that this chart provided the length of fingerlings purchased in any of HVG's orders.

[44] On May 8, 2014, Commerce issued another supplemental questionnaire requesting: (1) "an electronic copy in Excel of Exhibit 2, found in [HVG's] response; (2) "translations of the invoices found in Exhibit 1"; (3) "translation of the last document found in Exhibit 2"; and (4) "an explanation of how HVG determines the differences between different quantities of fingerlings (*i.e.* columns three, four and five) reported in Exhibit 2."  Letter from Commerce to HVG re: Supplemental Section D Questionnaire at Att. 1, PD 147, bar code 3200447-01 (May 8, 2014).  Agifish avers that HVG responded on May 22, 2014 and June 6, 2014, supplementing the information it submitted on May 2, 2014, with fingerling lengths along with sample contracts demonstrating those lengths.  See Agifish Br. 51; (citing Agifish Supplemental Section D Questionnaire Response at 2, PD 212, bar code 3203959-01 (May 22, 2014)).

On June 11, 2014, Commerce acknowledged receiving supplemental responses from HVG, but it rejected those portions of HVG's May 22, 2014 supplemental Section D questionnaire response because they "contain new, unrequested factual information, and this factual information is untimely pursuant to [19 C.F.R. § 351.301(c)(2)(ii)]."  Rejection of New Factual Info. at 1; see also Final Decision Memo at 35.  In response, HVG resubmitted its May 22, 2014, submission on June 16, 2014 after removing the fingerling length data rejected by Commerce. See Resubmission of Agifish Supplemental Section D Questionnaire Response, PD 232–233, bar codes 3209242-01–02 (June 16, 2014).

Agifish argues that Commerce requested length data in its May 8, 2014 supplemental questionnaire because its April 14, 2014 questionnaire asked for fingerling "size data." Agifish Br. 52. Agifish contends that, although its original response provided size data in pieces per kilogram, length data is also responsive to Commerce's original April 14, 2014 questionnaire because length data is "size data." See id. However, just because Commerce's initial questionnaire asked for fingerling size data does not mean that Commerce's supplemental questionnaires implicitly invited any further response to Commerce's initial questionnaire other than those items for which Commerce specifically requested clarification. Commerce reasonably determined that no portion of its May 8, 2014 supplemental request sought additional length information from respondent. See Final Decision Memo at 35 (citing Letter from Commerce to HVG re: Supplemental Section D Questionnaire at Att. 1, PD 147, bar code 3200447-01 (May 8, 2014)). Agifish points to no language in Commerce's May 8, 2014 supplemental questionnaire that indicates Commerce requested additional size data or otherwise requested length information. Commerce also reasonably determined the length information submitted on May 22, 2014, was untimely in response to its initial questionnaire, which did request size data, because it was submitted beyond 30 days from the date of receipt of Commerce's initial questionnaire (i.e., beyond May 14, 2014). See Final Decision Memo at 35; 19 C.F.R. § 351.301(d)(1)(i); see also Agifish Supplemental Section D Questionnaire Response, PD 212, bar code 3203959-01 (May 22, 2014).

Agifish also argues that, even if the length information submitted by HVG was untimely, Commerce abused its discretion by refusing to accept it because the length

information submitted results in more accurate margins.  Agifish Br. 52.  Indeed, an

interested party could nearly always claim that consideration of untimely new factual

information might result in more accurate margins.   Therefore, in evaluating whether

Commerce's rejection of untimely factual information is an abuse of discretion, the court

reviews Commerce's decision to see if its decision is clearly unreasonable, arbitrary, or

fanciful, is based on an erroneous conclusion of law, rests on clearly erroneous fact

findings, or follows from a record that contains no evidence on which Commerce could

rationally base its decision.  See Gerritsen v. Shirai, 979 F.2d 1524, 1529 (Fed. Cir. 1992).

Commerce's exercise of its discretion was made with a rational explanation and followed

its established regulations concerning the timely submission of factual information.  See

Final Decision Memo at 52; see also 19 C.F.R. § 351.302(c)(1).  Moreover, Agifish points

to no reasonable excuse as to why the length information could not have been timely

filed, nor did it raise any such reasonable excuse before Commerce.  The court will not

disturb Commerce's justifiable enforcement of the time frames provided in its regulations.

Under these circumstances, Commerce had a legitimate interest in promoting timely

responses to its questionnaires in order to complete its review within tight statutorily

prescribed deadlines, see 19 U.S.C. § 1675(a)(2)(B)(iii), and Commerce reasonably

determined that HVG's length information was not timely filed.

## IV.    **CASEAMEX's Separate Rate Application**

CASEAMEX argues that Commerce's determination that CASEAMEX was not

entitled to a separate rate is unsupported by substantial evidence.  See CASEAMEX Br.

15–41.  Defendant responds that CASEAMEX failed to demonstrate that it is free from de

facto government control, specifically that it has autonomy from the government in selecting management.  See Def.'s Resp. Br. 67–73.  The record facts relied on by Commerce cannot support its determination.  Therefore, Commerce's decision is not supported by substantial evidence.

In an administrative review of an AD order, Commerce is generally required to determine individual antidumping duty rates for each known exporter or producer of subject merchandise covered by the review based on its own sales of subject merchandise.  19 U.S.C. § 1677f-1(c)(1).  However, Commerce may limit its examination to exporters and producers accounting for the largest volume of subject merchandise from the exporting country that can be reasonably examined if the number of exporters or producers involved in the proceeding make it impracticable to calculate individual rates.[45] See 19 U.S.C. § 1677f-1(c)(2)(B).

Through practice, Commerce has implemented a presumption that all respondents within an NME country are subject to government control and should be assigned a single "NME-wide" AD rate "unless the exporter demonstrates the absence of both *de jure* and

---

[45] Although the statute permits Commerce to alternatively limit its examination to a statistically valid sample of exporters, producers, or types of products, see 19 U.S.C. § 1677f-1(c)(2)(A), Commerce typically limits the individual examination in reviews to "exporters and producers accounting for the largest volume of the subject merchandise from the exporting country" according to U.S. Customs and Border Protection import data.  See Proposed Methodology for Respondent Selection in Antidumping Proceedings, 75 Fed. Reg. 78,678, 78,678 (Dep't Commerce Dec. 16, 2010) (request for comment) (stating that Commerce has used this option in "virtually every one of its proceedings").  CASEAMEX does not challenge Commerce's authority to limit the number of exporters individually examined.

*de facto* governmental control over its export activities."[46]  Import Admin., U.S. Dep't Commerce, <u>Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries</u>, Policy Bulletin 05.1 (2005) at 1, <u>available at</u> http://enforcement.trade.gov/policy/bull05-1.pdf (last visited Jan. 18, 2017) ("Policy Bulletin 05.1");  <u>see also</u> <u>Antidumping Methodologies in Proceedings Involving Non-Market Economy Countries: Surrogate Country Selection and Separate Rates</u>, 72 Fed. Reg. 13,246, 13,247 (Dep't Commerce Mar. 21, 2007) (request for comment).  If an NME respondent demonstrates both de jure and de facto independence from governmental control in its export activities, Commerce's practice is to consider that respondent eligible for a rate that is separate from the NME-wide rate.[47] <u>See</u> Policy Bulletin 05.1 at 1.[48]

According to Commerce's practice, a respondent may rebut the presumption of de facto government control by showing that: 1) export prices are not set by, or subject to the approval of, a governmental authority; 2) the respondent has authority to negotiate and sign contracts and other agreements; 3) the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of

---

[46] The statute itself does not contain a presumption that respondents applying for separate rate status in NME AD reviews are under government control.  <u>See</u> 19 U.S.C. § 1677f-1.  However, no party challenges Commerce's authority to apply this presumption.

[47] Separate rate respondents are ordinarily assigned an antidumping duty rate based on a weighted average of the rates calculated for the individually examined respondents rather than the NME country-wide rate, excluding zero or de minimis rates and rates based entirely on the application of facts otherwise available.  <u>See</u> 19 U.S.C. § 1673d(c)(5)(A).

[48] Otherwise, that respondent's exports are attributed to the NME country, and it is assigned the NME country-wide rate.  <u>See</u> Policy Bulletin 05.1 at 1; <u>Antidumping Methodologies in Proceedings Involving Non-Market Economy Countries: Surrogate Country Selection and Separate Rates</u>, 72 Fed. Reg. at 13,247.

its management; and 4) the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses. Policy Bulletin 05.1 at 2; see also Silicon Carbide from the People's Republic of China, 59 Fed. Reg. 22,585, 22,587 (Dep't Commerce May 2, 1994).[49]

Commerce's practice does not require a respondent to rebut the potential for government control, but rather actual control by the government entity. See Final Results of Redetermination Pursuant to Remand Order for Diamond Sawblades and Parts Thereof from the People's Republic of China at 7,14 (May 6, 2013) available at http://enforcement.trade.gov/remands/12-147.pdf (last visited Jan. 18, 2017) ("Diamond Sawblades Remand"). To do so, a respondent must show that the government neither actually selects management nor directly or indirectly involves itself in the day-to-day management of the company.[50] See 1, 1, 1, 2-Tetrafluoroethane From the People's Republic of China, 79 Fed. Reg. 62,597 (Dep't Commerce Oct. 20, 2014) (final determination of sales at less than fair value) and accompanying 1,1,1,2-

---

[49] To determine whether a company is independent from governmental control in its export activities to qualify for a separate rate, Commerce analyzes the information provided by respondent relating to the absence of de jure and de facto control. Policy Bulletin 05.1 at 2–3; see also Silicon Carbide from the People's Republic of China, 59 Fed. Reg. 22,585, 22,587 (Dep't Commerce May 2, 1994) (notice of final determination of sales at less than fair value). The court does not analyze any findings on the absence of de jure control over CASEAMEX because Commerce denied CASEAMEX's separate rate application on the grounds that it failed to rebut the presumption of de facto government control. See Final Decision Memo at 5, 87.

[50] Neither party contests that it is within Commerce authority to presume governmental control of an exporter operating in an NME or that the burden is on exporters to demonstrate an absence of central government control in NME cases. CASEAMEX Br. 12; Def.'s Resp. Br. 62; see also Sigma Corp. v. United States, 117 F.3d 1401, 1405 (Fed. Cir. 1997). However, CASEAMEX argues that the presumption operates only where a respondent does not put forth detracting evidence. Oral Argument 01:24:05–01:24:28, Dec. 8, 2016, ECF No. 120. CASEAMEX argues that once a respondent puts forth evidence, Commerce may not ignore that detracting evidence. Id.

**PUBLIC VERSION**

Tetrafluoroethane from the People's Republic of China: Issues and Decision Memorandum for the Final Determination of Sales at Less Than Fair Value Antidumping Duty Investigation at 10–11, A-570-998, (Oct. 14, 2014), <u>available at</u> http://ia.ita.doc.gov/frn/summary/prc/2014-24903-1.pdf (last visited Jan. 18, 2017) ("Tetra from PRC I&D"); Diamond Sawblades Remand at 8–9.

      Commerce's conclusion that CASEAMEX failed to demonstrate a lack of direct or indirect government influence over the actual selection of CASEAMEX's management is not supported by substantial evidence.  CASEAMEX provided record evidence that neither CASEAMEX's largest shareholder,[51] who was also appointed the sole representative with authority to vote the shares owned by a government entity,[52] nor the government owned entity itself alone had the authority to appoint Directors without the approval of 65% of the General Meeting of Shareholders.[53]  <u>See</u> Can Tho Import-Export Joint Stock Company (CASEAMEX) Separate Rate Application at Ex. 10 at Art. 25.2, CD 46–51, bar codes 3168607-01–06 (Dec. 17, 2013) ("CASEAMEX SRA").  This evidence offered by CASEAMEX rebutted the presumption of government control because nothing

---

[51] Commerce found that CASEAMEX's largest shareholder, [[
                                              ]], is the [[
                      ]]'s representative.  <u>See</u> Separate Rate Memo at 6; <u>see also</u> <u>id.</u> at 2 n.9.

[52] Commerce found the [[
                                         ]] is the local government authority and acts as the executive committee of the administrative body of the central government in the Can Tho City Area, which reports directly to the [[                    ]]. <u>See</u> Separate Rate Memo at 5.

[53] Commerce inferred the [[                    ]]'s involvement in the day-to-day operations of CASEAMEX from the fact that the government's representative had the sole ability to nominate members to the [[                    ]] coupled with the independent fact that the [[
           ]] controlled CASEAMEX's independent operations.  <u>See</u> Separate Rate Memo at 6.

about such an arrangement supports a reasonable inference that the government directly

or indirectly selected management where the government's representative did not control

sufficient shares to approve management and directors.   Commerce relies upon the

Diamond Sawblades Remand for the proposition that an organization owned by a

government entity exerts influence over the selection of management by placing officials

on its board.  Separate Rate Memo at 7 (citing Diamond Sawblades Remand at 8–9).

However, although Commerce's found that CASEAMEX's largest shareholder was

appointed as the government entity's [[


]], this evidence does not support a reasonable inference that

CASEAMEX's largest shareholder is controlled directly or indirectly by the government.[54]

Moreover, no record evidence supports the notion that CASEAMEX's largest shareholder

had any such authority prior to the selection of CASEAMEX's directors and

---

[54] Defendant also argues that Commerce meant to ground its inference that the government retained control over [[          ]] shares in its finding that [[          ]] is the representative of the People's Committee.  See Def.'s Resp. Br. 65 n. 12; Oral Argument at 00:59:09–01:00:08, Dec. 8, 2016, ECF No. 120 (citing CASEAMEX Second Suppl. Resp. at Ex. S2-3); see also Separate Rate Memo at 5 (citing CASEAMEX Second Suppl. Resp. at Ex. S2-3).  Defendant argues that this inference is further supported by an affidavit on the record from [[          ]] stating that he was appointed as the [[                    ]] sole and exclusive representative "to make all decisions on their behalf, including the appointment, replacement and removal of any directors and management."  Def.'s Resp. Br. 65 (citing CASEAMEX Second Suppl. Resp. at Ex. S2-2); see also Separate Rate Memo at 6 (citing CASEAMEX Second Suppl. Resp. at Ex. S2-2).  However, Commerce does not explain how either document evidencing [[          ]] appointment as the [[                    ]] sole representative "making favorable conditions for monitoring and running the business" supports an inference that the government retained control over its shares or had influence over [[          ]] voting of their shares.  See CASEAMEX Second Suppl. Resp. at Ex. S2-3.  On remand it must do so or reconsider its determination.

management.[55]   Therefore, Commerce's determination is unsupported by substantial evidence.

In finding CASEAMEX failed to demonstrate autonomy in its selection of management, it is unclear whether Commerce relied upon the potential for the government to nominate an individual to CASEAMEX's board or to management based on its ownership in the company alone, or whether Commerce found that the government indirectly nominated all of its board members and managers by nominating a representative who appointed [[          ]] board members and managers.[56]   This lack

---

[55] CASEAMEX highlights record evidence that the [[                              ]] did not assign its shareholder rights to [[          ]] until September 12, 2012, well after the selection of directors in 2006 referenced by Commerce to connect the government's control of [[        ]] to [[      ]] selection of managers and directors of CASEAMEX.  See CASEAMEX Reply Br. Confidential Version 11, Sept. 9, 2016, ECF No. 102 (citing Can Tho Import-Export Joint Stock Company (CASEAMEX) Second Separate Rate Supplemental Questionnaire at Ex. S2-3, CD 117, bar code 3192727-01 (Apr. 2, 2014)); see also CASEAMEX SRA at Exs. 13A, 13B, and 14. Defendant responds that even though most of the directors were appointed before the [[            ]] appointed [[        ]] as its sole representative, [[            ]] was appointed as [[            ]] with a letter signed by [[        ]] after being appointed as the [[                    ]] representative.  Oral Argument at 01:05:20–01:06:23, Dec. 8, 2016, ECF No. 120 (citing CASEAMEXSRA at Ex. 13B).  However, this evidence alone does not address Commerce's failure to explain what supported its inference that [[                    ]] controlled the day to day operations of the company despite the fact that it could not have appointed any of the members of the [[                          ]] without the approval of other shareholders.
[56] Defendant conceded at oral argument that Commerce must find actual control by the [[            ]] in order to determine that an exporter is under de facto government control.  Oral Argument at 01:14:26–01:14:28, Dec. 8, 2016, ECF No. 120.  Defendant argues that Commerce grounded that finding of actual control in its finding that [[        ]] appointed a [[              ]] effective [[                  ]] as well as, through [[            ]] capacity to vote a block of over [[    ]] percent and thereby block the nomination of any other member being nominated at the general shareholders meeting.  Oral Argument at 01:14:38–01:14:57, Dec. 8, 2016, ECF No. 120 (citing CASEAMEX SRA Ex. 13B).  CASEAMEX concedes that [[        ]] may block candidates from being nominated to the board.  Oral Argument at 00:57:22–00:57:30, Dec. 8, 2016, ECF No. 120.  However, as discussed in more detail below, the record documents

(footnote continued)

of clarity is significant because, if Commerce relied solely upon the government's potential to nominate a manager or a board member with control over day-to-day company operations, it would be deviating from its practice of requiring that the government either actually appoint management or be directly or indirectly involved in the management of the company. <u>See</u> Tetra from PRC I&D at 10–11; Diamond Sawblades Remand at 8–9. If Commerce intended to deviate from its practice, on remand it must explain the reasonableness of that deviation. <u>See</u> <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State</u> <u>Farm Mut. Auto Ins. Co.</u>, 463 U.S. 29, 42 (1983).

If, on the other hand, Commerce inferred day-to-day control by the government entity over CASEAMEX because the government in fact nominated a representative, [[                                                                                       ]], this determination is not supported by substantial evidence.  Record evidence clearly establishes that all of the directors whose appointment letters Commerce references were selected and appointed prior to the government entity's nomination of its representative.  <u>See</u> Can Tho Import-Export Joint Stock Company (CASEAMEX) Second Separate Rate Supplemental Questionnaire at Ex. S2-3, CD 117, bar code 3192727-01 (Apr. 2, 2014); CASEAMEX SRA at Exs. 13A,

---

demonstrate that the government did not, and indeed could not itself appoint members of either [[                                                             ]] without the approval of the shareholders.  Moreover the record documents relied upon by Commerce do not demonstrate that [[                                           ]] was directly involved in the appointment of management and directors.  <u>See</u> CASEAMEX SRA at Exs. 13, 14, and 15.  The evidence relied upon by Commerce does not demonstrate that [[        ]] capacity to block nominations of management or to the board was actualized or that [[                                    ]] continued to exercise control over their own shares after they were transferred to [[          ]].  Moreover, Commerce does not point to any record evidence that the [[                        ]] itself actually controlled [[            ]] shares.  On remand, it must do so or reconsider its determination.

13B, and 14.  On remand, Commerce must explain what record evidence demonstrates direct or indirect government involvement in selecting members of CASEAMEX's board or reconsider its determination.

To the extent Commerce determined that the government indirectly controls the selection of management because its representative has the sole capacity to appoint board members and that the government, through its representative, has the capacity to block nominations to the board, those determinations are also not supported by substantial evidence. See Separate rate Memo at 6 (citing CASEAMEX SRA at Exs. 13A, 13B, and 14.[57]  Commerce concludes that [[          ]] must have appointed all of the members of the [[                    ]] because only [[           ]] and the government entity surpass the ownership threshold required by CASEAMEX's Articles of Association to

---

[57] Since Commerce found [[          ]] held [[          ]] of the shares of CASEAMEX, Separate Rate Memo at 5, even if [[          ]] voted all his shares together with those of [[          ]], he could nominate up to [[          ]] members of the board.  See CASEAMEX SRA at Ex. 10 at Art. 25.2. However, since the board is comprised of at minimum [[    ]] members, see CASEAMEX SRA at Ex. 10 at Art. 25.1, at no point could [[          ]] have had the sole ability to nominate all board members.  Moreover, all of documents reflecting the appointment of board members on the record show that all board members were appointed prior to the [[          ]] assignment of its share to [[          ]].  See CASEAMEX SRA at Exs. 13, 14, and 15; CASEAMEX Second Suppl. Resp. at Ex. S2-3.
    Commerce relies upon the Diamond Sawblades Remand to infer that the [[          ]] exerted influence over the selection of management.  See Separate Rate Memo at 7 (Diamond Sawblades Remand at 8–9).  In the Diamond Sawblades Remand, Commerce found that the respondent failed to demonstrate an absence of de facto control because a 100 percent government-owned entity was the largest shareholder of the respondent and was the only shareholder able to nominate candidates to the board of directors.  Diamond Sawblades Remand at 8.  Here, Commerce did not find the [[          ]] to be CASEAMEX's largest shareholder.  Since Commerce's finding that [[          ]] is not the only shareholder capable of nominating board members is not supported by substantial evidence, on remand, Commerce must explain why it is reasonable to conclude that the [[          ]] exerts actual control over CASEAMEX's selection of management in circumstances where it is neither the largest shareholder nor the only shareholder capable of nominating board members or reconsider its determination.

appoint board members.[58]  See Separate Rate Memo at 6.  However, this finding is not

supported by the record because Commerce does not explain why shareholders with

smaller shareholdings could not band together to surpass this ownership threshold.  See

id.  This finding is critical to Commerce's determination because Commerce relies upon

it to connect the government entity to [[              ]] selection of board members.  See id.

Commerce appears to infer that the government entity must have actually appointed

management because no other shareholder had the capacity to do so.  See id.  If other

shareholders could have put forward candidates to the Board of Directors, then

Commerce's inference of indirect control is unreasonable.  If other shareholders could not

put forward candidates to [[                         ]], Commerce must explain what record

evidence supports such a finding.[59]

---

[58] CASEAMEX's Articles of Association indicate [[

                   ]]  CASEAMEX SRA at Ex. 10 at 25.2.  The Articles of Association
specifically provide that [[

        ]].  Id. at Ex. 10 at Arts. 12.3, 25.2.
[59] Defendant argues that Commerce reasonably concluded that Article 25.2 of CASEAMEX's
Articles of Association means that only individual shareholders who themselves hold at least
[[ ]]% of voting shares may band together with other shareholders.  Oral Argument at 01:08:18–
01:08:26, Dec. 8, 2016, ECF No. 120.  Defendant also argues that CASEAMEX's questionnaire
response corroborates this reading, stating that
        [t]he Department correctly notes that [[

                                   ]]  Further, the Department also correctly
        notes that [[
                                                      ]]
Oral Argument at 01:08:28–01:09:03:, Dec. 8, 2016, ECF No. 120 (quoting CASEAMEX Second
Suppl. Resp. 4).   However, the fact that CASEAMEX's Articles of Association and its
questionnaire response indicate that "[[                                          ]]" does not preclude

                                                    (footnote continued)

Consol. Court No. 15-00044                                                   Page 63
**PUBLIC VERSION**

Moreover, even assuming *arguendo* that [[          ]] is controlled by [[

]], Commerce does not explain why the government's involvement in the

selection of CASEAMEX's management is actual and not just potential.[60]  Defendant also

highlights the fact that [[          ]], voting his shares together with those of [[

]] has the effect of denying the 65% approval required for a board member.

Def.'s Resp. Br. 71 (citing CASEAMEX SRA at Ex. 10 Art. 25.2).  Although it may be

reasonable to infer that the [[                    ]] could withhold its support at any time,

Commerce has not explained why it is reasonable to infer that [[                    ]]

actually influenced the appointment of board members when this arrangement only came

into effect after the appointment of [[          ]] as the [[                    ]]

representative.

Defendant argues that "[a] company operating in an NME-designated country is

not autonomous from government control when the government maintains a significant

---

individual shareholders each holding less than [[ ]]% from banding together to reach the [[ ]]%
threshold for nominating board members.  On remand, Commerce must explain why interpreting
CASEAMEX's Articles of Association to permit only an individual shareholder on its own holding
[[ ]]% or more of CASEAMEX's shares to nominate a director or board member rather than
collectively with other shareholders is reasonable or reconsider its determination.
[60] Commerce found that [[          ]] owns [[          ]] of CASEAMEX and [[
]] owns [[          ]] of CASEAMEX.  Separate Rate Memo at 5.  According to Article
25.2 of CASEAMEX's Articles of Association, since each holds between [[ ]]% and [[ ]]% of
voting shares in CASEAMEX, [[                    ]] and [[          ]] each can appoint two
members of the [[                    ]].  See CASEAMEX SRA at Ex. 10 at Art. 25.2.
CASEAMEX acknowledges that the Board of Directors/Management consists of five individuals.
CASEAMEX Br. 24 (citing CASEAMEX SRA at Ex. 14).  Even if [[          ]] depends upon his
ability to control the [[                    ]] shares to appoint a controlling share of the board
because without his right to vote the [[                    ]] shares he could only nominate [[ ]]
of the [[ ]] directors, Commerce does not explain why it is reasonable to infer that [[          ]] is
controlled by [[                    ]] or that [[          ]] shares inure to the benefit of the
[[                    ]].

ownership interest in that company." Def.'s Resp. Br. 63 (citing Tetra from PRC I&D at

10–11). Commerce cites a discussion from Tetra from PRC I&D at 10–11 for the

proposition that government ownership is significant when the government ownership

passes the threshold to nominate a board member. See Separate Rate Memo at 6 (citing

Tetra from PRC I&D at 4–13). Defendant implies that the capacity to nominate board

members together with independent evidence that the board controls day-to-day

operations of the company is sufficient to support a finding of de facto control. See Def.'s

Resp. Br. 63 (citing Tetra from PRC I&D at 4–13). However, in Tetra from the PRC I&D,

Commerce inferred government control over an individual because that individual sat on

the board of a 100 percent government-owned entity. See Tetra from the PRC I&D at

10–11. Commerce did not find that [[          ]] sat on the board of a 100 percent

government owned entity. To the extent Commerce continues to rely upon Tetra from

the PRC I&D, on remand Commerce must explain why it is reasonable to infer that the

government has actual control over CASEAMEX's largest shareholder or explain why it

is reasonable to infer government control over CASEAMEX without such evidence.

## V.    Recalculation of Dumping Margin Assigned to Separate Rate Companies

Anvifish argues that the margin assigned to separate rate respondents should be

revised in the event the dumping margin for mandatory respondent, HVG, is reduced.

Anvifish Br. 38–40. Since the court remanded the issue of Commerce's SV data selection

for fish feed for further consideration, it is unclear whether the margin calculations for

mandatory respondent HVG will change in Commerce's remand redetermination until

Commerce's reconsiders this issue.   The court defers consideration of Anvifish's

challenge until its review of Commerce's remand redetermination.

## CONCLUSION

The court remands Commerce's SV data selection for fish feed and Commerce's

decision not to grant CASEAMEX separate rate status in this administrative review for

further consideration and explanation.  The court sustains the <u>Final Results</u> in all other

respects.  In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's determination is remanded for further consideration

consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand determination with the court within

45 days of this date; and it is further

**ORDERED** that Plaintiffs and Consolidated Plaintiffs and Plaintiff-Intervenors shall

have 30 days thereafter to file comments; and it is further

**ORDERED** that Defendant and Defendant-Intervenor shall have 15 days

thereafter to file their replies to comments on the remand determination


                                                    /s/ Claire R. Kelly___
                                                    Claire R. Kelly, Judge

Dated: <u>January 23, 2017</u>
         New York, New York