Slip Op. 18-4

## UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| **AN GIANG FISHERIES IMPORT AND EXPORT JOINT STOCK COMPANY ET AL.,** |
| **Plaintiffs and Consolidated Plaintiffs,** |
| **and** |
| **ANVIFISH JOINT STOCK COMPANY ET AL.,** |
| **Plaintiff-Intervenors and Consolidated Plaintiff-Intervenors,** |
| **v.** |
| **UNITED STATES,** |
| **Defendant,** |
| **and** |
| **CATFISH FARMERS OF AMERICA ET AL.,** |
| **Defendant-Intervenors and Consolidated Defendant-Intervenors.** |

**Before: Claire R. Kelly, Judge**

**Consol. Court No. 15-00044**
**PUBLIC VERSION**

## OPINION AND ORDER

[Sustaining the U.S. Department of Commerce's remand redetermination in its antidumping investigation of certain frozen fish fillets from the Socialist Republic of Vietnam.]

Dated: January 19, 2018

Matthew Jon McConkey, Mayer Brown LLP, of Washington, DC, for plaintiffs and consolidated plaintiff-intervenors An Giang Fisheries Import and Export Joint Stock Company; Asia Commerce Fisheries Joint Stock Company; Cuu Long Fish Joint Stock Company; Hiep Thanh Seafood Joint Stock Company; International Development and Investment Corporation; NTSF Seafoods Joint Stock Company; Thuan An Production Trading and Services Co., Ltd.; and Vinh Quang Fisheries Joint Stock Company.

Andrew Brehm Schroth, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Hong Kong, S.A.R., and Ned Herman Marshak, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY, and Andrew Thomas Schutz and Dharmendra Narain

Choudhary, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, DC, for plaintiff-intervenors and consolidated plaintiffs Anvifish Joint Stock Company; Asia Commerce Fisheries Joint Stock Company; Cadovimex II Seafood Import-Export and Processing Joint Stock Company; Dai Thanh Seafoods Company Limited; Fatifish Company Limited; Hoang Long Seafood Processing Company Limited; Nam Viet Corporation; East Sea Seafoods Limited Liability Company a/k/a East Sea Seafoods LLC; QVD Food Company Ltd.; Saigon-Mekong Fishery Co., Ltd.; and Can Tho Import-Export Joint Stock Company.

Kara Marie Westercamp, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.  With her on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director.  Of Counsel on the brief was Nanda Srikantaiah, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Nazakhtar Nikakhtar, Heather Kay Pinnock, and Nina Ritu Tandon, Cassidy Levy Kent (USA) LLP, of Washington, DC, for defendant-intervenors and consolidated defendant-intervenors Catfish Farmers of America; America's Catch; Alabama Catfish Inc. d/b/a Harvest Select Catfish, Inc.; Heartland Catfish Company; Pride of the Pond; and Simmons Farm Raised Catfish, Inc.

Kelly, Judge:  Before the court for review is the U.S. Department of Commerce's ("Department" or "Commerce") remand redetermination filed pursuant to the court's decision in An Giang Fisheries Import and Export Joint Stock Company v. United States, 41 CIT __, 203 F. Supp. 3d 1256 (2017) ("An Giang").  See Final Results of Redetermination Pursuant to An Giang Fisheries Import and Export Joint Stock Company et al. v. United States, Consol. Court No. 15-00044, Slip Op. 17-4 (Jan. 23, 2017), (June 21, 2017), ECF No. 133 ("Remand Results"); see also An Giang, 41 CIT __, 203 F. Supp. 3d at 1294–95.

In An Giang, the court remanded Commerce's final determination in the tenth administrative review of the antidumping duty ("ADD") order on certain frozen fish fillets from the Socialist Republic of Vietnam ("Vietnam") to further explain or reconsider Commerce's surrogate value data selection for fish feed and Commerce's decision not to

Case 1:15-cv-00044-CRK   Document 171   Filed 01/26/18   Page 3 of 24

Consol. Court No. 15-00044                                                    Page 3
**PUBLIC VERSION**

grant Can Tho Import-Export Joint Stock Company ("CASEAMEX") separate rate status.

See An Giang, 41 CIT at __, 203 F. Supp. 3d at 1294–95; see generally Certain Frozen

Fish Fillets From the Socialist Republic of Vietnam, 80 Fed. Reg. 2,394 (Dep't Commerce

Jan. 16, 2015) (final results of [ADD] administrative review; 2012–2013) ("Final Results")

and accompanying Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:

Issues and Decision Memorandum for the Final Results of the Tenth [ADD] Administrative

Review; 2012–2013, A-552-801, (Jan. 7, 2015), ECF No. 20 ("Final Decision Memo");

Certain Frozen Fish Fillets from the Socialist Republic of Vietnam, 68 Fed. Reg. 47,909

(Dep't Commerce Aug. 12, 2003) (notice of [ADD] order).  The period of review ("POR")

for the tenth administrative review was August 1, 2012 through July 31, 2013.  Final

Results, 80 Fed. Reg. at 2,394.

On remand, Commerce provided further explanation of its determination to value

respondents' fish feed using prices contained in the affidavit of Dr. Djumbuh Rukmono,

an official from the Indonesian Ministry of Marine Affairs and Fisheries ("Rukmono

Affidavit").   See Remand Results at 16–25; see also Petitioners' Surrogate Country

Comments and Submission of Proposed Factor Values at Ex. 16-B, PD 182, bar code

3200753-04 (May 12, 2014) (containing the Rukmono Affidavit).[1]   Commerce also

provided further explanation of its determination to deny CASEAMEX separate rate

status.    Remand Results at 2–16.    For the reasons that follow, Commerce's

---

[1] On April 6, 2015, Defendant submitted indices to the public and confidential administrative records which identify the record documents for Commerce's final determination in the tenth ADD administrative review.  These indices are located on the docket at ECF No. 20.  All further references to administrative record documents are identified by the numbers assigned by Commerce in these indices.

Case 1:15-cv-00044-CRK   Document 171   Filed 01/26/18   Page 4 of 24

Consol. Court No. 15-00044                                                    Page 4
**PUBLIC VERSION**

determinations in the <u>Remand Results</u> to value fish feed using the Rukmono Affidavit data and to deny CASEAMEX separate rate status are sustained.

**BACKGROUND**

The court presumes familiarity with the facts of this case as discussed in the previous opinion, <u>see</u> An Giang, 41 CIT at __, 203 F. Supp. 3d at 1260–62, and here recounts the facts relevant to the court's present review of the <u>Remand Results</u>.  In the tenth ADD administrative review, Commerce examined Hung Vuong Group ("HVG"), which includes An Giang Fisheries Import & Export Joint Stock Company and other exporters of subject merchandise, as the sole mandatory respondent.  <u>See</u> Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Decision Memorandum for the Preliminary Results of the 2012–2013 [ADD] Administrative Review at 1 n.2, 2–3,8–9, PD 236, bar code 3213671-01 (July 2, 2014).  Commerce also reviewed separate rate applications from 23 companies, including one from CASEAMEX.  <u>Id.</u> at 6, 8.  Pertinent here, in the final determination, Commerce did not rely on the prices contained in an article from the Indonesian magazine, Trobos Aqua ("Trobos Aqua Article"), and instead relied on the Rukmono Affidavit to value respondents' reported fish feed as a farming factor of production.  <u>See</u> Final Decision Memo 35–40; <u>see generally</u> Rukmono Affidavit; An Giang Fisheries Import and Export Joint Stock Company—Direct Surrogate Values at Ex. 1.A, PD 159, bar code 3201162-02 (May 12, 2014) (containing the Trobos Aqua Article).  Further, Commerce reconsidered its separate rate determination with respect to CASEAMEX and concluded that CASEAMEX failed to demonstrate independence in the selection of management.  <u>See</u> Final Decision Memo at 5, 87; <u>see also</u> Memorandum re: Proprietary Analysis of Comment XXI: CASEAMEX – Separate Rate Status at 1, 4–7, CD

Case 1:15-cv-00044-CRK   Document 171   Filed 01/26/18   Page 5 of 24

Consol. Court No. 15-00044                                             Page 5
**PUBLIC VERSION**

184, bar code 3251356-01 (Jan. 7, 2015) (providing Commerce's reasoning for denying

CASEAMEX separate rate status in a separate confidential memorandum because

Commerce's decision is based on business proprietary information).

In An Giang, the court sustained in part and remanded in part Commerce's

determination in the tenth administrative review of the subject merchandise.[2]  An Giang,

41 CIT at __, 203 F. Supp. 3d at 1261–62, 1294–95.  The court remanded the agency's

selection of the Rukmono Affidavit to value fish feed.  Id., 41 CIT at __, 203 F. Supp. 3d

at 1285–86, 1294–95.  The court determined that Commerce did not reasonably explain

why the Rukmono Affidavit "was representative of a broad-market average in this review,"

but not in the ninth administrative review.  Id., 41 CIT at __, 203 F. Supp. 3d at 1285.  The

court also determined that Commerce's decision to deny CASEAMEX separate rate

status in the tenth administrative review was not supported by substantial evidence, id.,

41 CIT at __, 203 F. Supp. 3d at 1288–94, and remanded the issue accordingly.  Id., 41

CIT at __, 203 F. Supp. 3d at 1294–95.  The court noted that Commerce failed to explain

how the government of Vietnam, through [[                    ]], referred to here as Mr. X,

was able to influence, either directly or indirectly, "the actual selection of CASEAMEX's

management[.]"  Id., 41 CIT at __, 203 F. Supp. 3d at 1290 (footnotes omitted) (citing Can

Tho Import-Export Joint Stock Company (CASEAMEX) Separate Rate Application at Ex.

10 at Art. 25 ¶2, CD 46–51, bar codes 3168607-01–06 (Dec. 17, 2013) ("CASEAMEX

---

[2] Specifically, in An Giang, the court sustained Commerce's selection of Indonesia as the primary surrogate country for the tenth administrative review.  See An Giang, 41 CIT at __, 203 F. Supp. 3d at 1262–72.  Further, An Giang also sustained Commerce's surrogate value selections for 1) medicines and antibiotics; 2) nutrition; 3) fingerlings; 4) packing tape; 5) packing strap; 6) various fish waste byproducts; 7) brokerage and handling; and 8) truck freight.  Id., 41 CIT at __, 203 F. Supp. 3d at 1273–84.

**PUBLIC VERSION**

SRA")).  The court also emphasized that Commerce did not, with sufficient clarity, explain why it deviated from its practice of "requiring that the government either actually appoint management or be directly or indirectly involved in the management of the company," relying instead "solely upon the government's potential to nominate a manager or a board member with control over day-to-day company operations."  An Giang, 41 CIT at __, 203 F. Supp. 3d at 1291–92 (citations omitted).  In light of CASEAMEX's ability to point to record evidence demonstrating that the government was not able to, either directly or indirectly, exercise actual control over the selection of CASEAMEX's management, and Commerce's failure to explain its reliance on "potential control" when its practice has been to look for actual control, the court determined that CASEAMEX was able to rebut the presumption of de facto government control.  See id., 41 CIT at __, 203 F. Supp. 3d at 1291–94.

## JURISDICTION AND STANDARD OF REVIEW

The court continues to have jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[3] and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting the final determination in an administrative review of an ADD order.  Commerce's antidumping determinations must be in accordance with law and supported by substantial evidence.  19 U.S.C. § 1516a(b)(1)(B)(i).  "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'"  Xinjiamei Furniture (Zhangzhou) Co. v. United States, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014)

---

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

**PUBLIC VERSION**

(quoting <u>Nakornthai Strip Mill Public Co. v. United States</u>, 32 CIT 1272, 1274, 587 F.

Supp. 2d 1303, 1306 (2008)).

## DISCUSSION

### I.  Surrogate Value for Fish Feed

In <u>An Giang</u>, the court remanded for further explanation or reconsideration

Commerce's decision to rely upon the Rukmono Affidavit to value respondents' fish feed.

<u>An Giang</u>, 41 CIT at __, 203 F. Supp. 3d at 1284–86, 1294–95; <u>see also</u> Rukmono

Affidavit.  Specifically, the court determined that Commerce had not explained how it

could reach opposite conclusions about the same affidavit in the ninth and tenth

administrative reviews.  <u>Id.</u>, 41 CIT at __, 203 F. Supp. 3d at 1284–85.

On remand, Commerce supported its finding that the Rukmono Affidavit was

representative of a broad-market average by referencing record evidence, available

during the tenth (but not ninth) administrative review, showing that the Rukmono

Affidavit's data represented 99.8 percent of total pangasius production in Indonesia in

2012.  <u>Remand Results</u> at 22.  In the tenth administrative review, Commerce determined

that the Rukmono Affidavit was representative of a broad-market average because it

covered the "vast majority" of the pangasius producing regions in Indonesia.   Final

Decision Memo at 39.   However, in the ninth administrative review, Commerce

determined that the very same Rukmono Affidavit, "with the same regional and temporal

coverage, was not representative of a broad market average[.]"  <u>An Giang</u>, 41 CIT at __,

203 F. Supp. 3d at 1286 (citing Certain Frozen Fish Fillets from the Socialist Republic of

Vietnam: Issues and Decision Memorandum for the Final Results of the Ninth

Administrative Review and Aligned New Shipper Review at 34, A-552-801, (Mar. 28,

**PUBLIC VERSION**

2014), <u>available at</u> http://ia.ita.doc.gov/frn/summary/vietnam/2014-07714-1.pdf (last

visited Jan. 16, 2018).[4]  On remand, Commerce explained its change of position by citing

to "material differences" in the records of the ninth and the tenth administrative reviews.

<u>Remand Results</u> at 19; <u>see</u> <u>id.</u> at 20–21.  Specifically, Commerce explained that it was

not until the tenth administrative review, that the Department became aware that "the

three provinces covered in the [Rukmono] Affidavit . . . represented 99.8 percent of

Indonesia's total pangasius production in 2012."   <u>Remand Results</u> at 22 (citing

[Memorandum to the File for the] Tenth Administrative Review of Certain Frozen Fish

Fillets from the Socialist Republic of Vietnam: Surrogate Values for the Preliminary

Results at Ex. 3, A-552-801, PD 238, bar code 3213863-01 (July 2, 2014)).  Commerce

explains on remand that the lack of knowledge as to the production yield of the three

provinces led it to discount the Rukmono Affidavit during the ninth administrative review

on the belief that the data from the three Indonesian provinces was not comparable to the

national data provided by the Trobos Aqua Article.  <u>Id.</u> at 21; <u>see generally</u> Trobos Aqua

Article; Rukmono Affidavit.  Commerce sufficiently explained why the Rukmono Affidavit

represented a broad-market average.  Comparatively, knowing that the data contained in

the Rukmono Affidavit "represent[ed] the supermajority of fish feed data from Indonesia .

. . [Commerce was able to conclude that the Rukmono Affidavit] provide[d] as much

broad-market average coverage" as the Trobos Aqua Article.  <u>Remand Results</u> at 22.

---

[4] In <u>An Giang</u>, the court took judicial notice of Commerce's determination in the ninth
administrative review, as allowed pursuant to section 2641 of the Customs Court Act of 1980, as
amended 28 U.S.C. § 2641(a), and Rule 201 of the Federal Rules of Evidence.  <u>An Giang</u>, 41 CIT
at __, 203 F. Supp. 3d at 1285; <u>see also</u> 28 U.S.C. § 2641(a) (2012); Fed. R. Evid. 201.

**PUBLIC VERSION**

Therefore, Commerce has complied with the court's order.   No party continues to

challenge Commerce's selection, and the determination is sustained.

## II. Commerce's Determination to Deny CASEAMEX Separate Rate Status

In An Giang, the court remanded Commerce's determination that the minority

government shareholder exercised control over the selection of management.  See An

Giang, 41 CIT at __, 203 F. Supp. 3d at 1288–95.  The court determined that Commerce's

decision was not supported by substantial evidence because CASEAMEX pointed to

record evidence that rebutted Commerce's presumption of de facto government control.[5]

Id., 41 CIT at __, 203 F. Supp. 3d at 1290–91 (footnotes and citations omitted).

Through practice, Commerce has implemented a presumption that all respondents

within a non-market economy ("NME") country are subject to government control and

should be assigned a single "NME-wide" ADD rate "unless an exporter demonstrates the

absence of both de jure and de facto governmental control over its export activities."[6]

---

[5] Specifically, CASEAMEX pointed to the 2012 Articles of Association which provided that neither Mr. X, the General Director and Chairman of the Board of Directors of CASEAMEX, nor the minority government shareholder, working together or alone, could push through the selection of management or election of a board member without 65 percent approval vote of the shareholders.

[6] In an administrative review of an ADD order, Commerce is generally required to determine individual ADD rates for each known exporter or producer of subject merchandise covered by the review.  19 U.S.C. § 1677f-1(c)(1).  However, Commerce may limit its examination to exporters and producers accounting for the largest volume of subject merchandise from the exporting country that can be reasonably examined, if the number of exporters or producers involved in the proceeding makes it impracticable to calculate individual rates.  See 19 U.S.C. § 1677f-1(c)(2)(B). Non-individually investigated respondents are assigned an "all-others" rate (usually an average of the individually-examined respondents' rates).  See 19 U.S.C. § 1673d(c)(5).  In a NME antidumping investigation, all exporters are presumed to be subject to government control and should be assigned a government rate, unless, they are able to rebut the presumption of control. Import Admin., U.S. Dep't Commerce, Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries, Policy Bulletin 05.1 at 1 (Apr. 5, 2005), available at http://enforcement.trade.gov/policy/bull05-1.pdf (last visited Jan 16, 2018).  Respondents seeking to rebut the presumption of government control submit a separate rate application.  Id. at 3–4.

**PUBLIC VERSION**

Import Admin., U.S. Dep't Commerce, <u>Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries</u>, Policy Bulletin 05.1 at 1 (Apr. 5, 2005) ("Policy Bulletin 05.1") (citation omitted), <u>available at</u> http://enforcement.trade.gov/policy/bull05-1.pdf (last visited Jan. 16, 2018); <u>see also</u> <u>Antidumping Methodologies in Proceedings Involving Non-Market Economy Countries: Surrogate Country Selection and Separate Rates</u>, 72 Fed. Reg. 13,246, 13,247 (Dep't Commerce Mar. 21, 2007) (request for comment) (stating the Department's policy of presuming control for companies operating within NME countries).  To determine whether a respondent has rebutted the presumption of de facto government control Commerce considers, inter alia, "whether the respondent has [pointed to record evidence showing] autonomy from the central, provincial and local governments in making decisions regarding the selection of its management[.]"[7]  Policy Bulletin 05.1 at 2; <u>see also</u> <u>Silicon Carbide from the People's Republic of China [("PRC")]</u>, 59 Fed. Reg. 22,585, 22,587 (Dep't Commerce May 2, 1994) (showing Commerce relying on the same factors to determine whether respondent was de facto independent).  If an NME respondent demonstrates both de jure and de facto independence from governmental control in its

---

[7] Commerce's Policy Bulletin 05.1 identifies four factors that Commerce will consider in determining whether a respondent is in fact not under de facto government control: 1) export prices are not set by, or subject to the approval of, a governmental authority; 2) the respondent has authority to negotiate and sign contracts and other agreements; 3) the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management; and 4) the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.  Policy Bulletin 05.1 at 2; <u>see also</u> <u>Silicon Carbide from the [PRC]</u>, 59 Fed. Reg. 22,585, 22,587 (Dep't Commerce May 2, 1994) (showing Commerce relying on the same factors to determine whether respondent was de facto independent).  Only factor three is implicated here.

Case 1:15-cv-00044-CRK   Document 171   Filed 01/26/18   Page 11 of 24

Consol. Court No. 15-00044                                              Page 11
**PUBLIC VERSION**

export activities, Commerce's practice is to consider that respondent eligible for a rate that is separate from the NME-wide rate.[8]  See Policy Bulletin 05.1 at 1.

According to Commerce's past practice, in a factual situation where the government owns, either directly or indirectly, a majority share of the respondent company, the government "has the potential to exercise[] control over the company's operations generally[.]"  See Decision Memorandum for the Preliminary Determination of the [ADD] Investigation of Carbon and Certain Alloy Steel Wire Rod from the [PRC] at 7, A-570-012, (Aug. 29, 2014), available at http://ia.ita.doc.gov/frn/summary/prc/2014-21335-1.pdf (last visited Jan. 16, 2018) ("Steel Wire Rod Decision Memo").  Commerce explains the reasoning behind its practice in Steel Wire Rod Decision Memo, see id. at 6–7, and replicates the reasoning in the later Tetrafluorethane determination.  See 1,1,1,2-Tetrafluoroethane from the [PRC]: Issues and Decision Memorandum for the Final Determination of Sales at Less Than Fair Value [ADD] Investigation at 8, A-570-998, (Oct. 14, 2014), available at http://ia.ita.doc.gov/frn/summary/prc/2014-24903-1.pdf (last visited Jan. 16, 2018) ("Tetra Decision Memo").  Specifically, in Tetra Decision Memo, Commerce explains that, following the Diamond Sawblades proceedings,[9] the agency

---

[8] Separate rate respondents are generally assigned an ADD rate based on a weighted-average of the rates calculated for the individually examined respondents, rather than the NME country-wide rate, excluding zero or de minimis rates and rates based entirely on the application of facts otherwise available.  See 19 U.S.C. § 1673d(c)(5)(A).

[9] "The Diamond Sawblades proceedings" refer to decisions discussing the metamorphosis of the separate rate test as applied in situations where the government is a majority shareholder.  See Advanced Technology & Materials Co. v. United States, 36 CIT __, 885 F. Supp. 2d 1343 (2012) (remanding for further consideration or explanation Commerce's determination in the first remand); Advanced Technology & Materials Co. v. United States, 37 CIT __, 938 F. Supp. 2d 1342 (2013) (sustaining Commerce's redetermination on remand), aff'd, 551 F. App'x 900 (Fed. Cir. 2014).  Following the Diamond Sawblades proceedings, Commerce, in Steel Wire Rod

(footnote continued)

Case 1:15-cv-00044-CRK   Document 171   Filed 01/26/18   Page 12 of 24

Consol. Court No. 15-00044                                          Page 12
**PUBLIC VERSION**

"concluded that where a government entity holds a majority ownership share, either

directly or indirectly, in the respondent exporter, the majority ownership holding in and of

itself means that the government exercises, or has the potential to exercise, control over

the company's operations generally."   Tetra Decision Memo at 8 (citing Steel Wire Rod

Decision Memo at 6–7)).   In both Steel Wire Rod Decision Memo and Tetra Decision

Memo, Commerce explained that a majority government shareholder will not be able to

rebut the presumption of government control because it is reasonable to assume that,

notwithstanding a lack of evidence of actual control, the majority shareholder is constantly

in possession of the ability to exercise actual control.[10]   See Steel Wire Rod Decision

Memo at 6–7; Tetra Decision Memo at 8.

On remand, Commerce explains that despite the Defendant's prior statement at

oral argument that Plaintiff has to rebut the presumption of actual control to obtain a

---

Decision Memo, clarified its practice as to respondent companies operating in an NME that have,
as a majority shareholder either a government-owned entity or the government itself.   Steel Wire
Rod Decision Memo at 6–7.   In Steel Wire Rod Decision Memo, Commerce explained that, "where
a government entity holds a majority ownership share, either directly or indirectly, in the
respondent exporter, the majority ownership holding in and of itself means that the government
exercises or has the potential to exercise control over the company's operations generally[.]"
Steel Wire Rod Decision Memo at 7.   This court in Jiasheng recognized Commerce's "revised
practice" as precluding "a finding of de facto autonomy," when the government is a majority
shareholder.   Jiasheng Photovoltaic Tech. Co. v. United States, 39 CIT __, __, 121 F. Supp. 3d
1263, 1266 (2015) ("This revised practice, which was sustained by this Court and subsequently
affirmed by the Court of Appeals, holds that 'where a government entity holds a majority
ownership share, either directly or indirectly, in the respondent exporter [or producer],' such
majority ownership holding 'in and of itself' precludes a finding of de facto autonomy." (footnotes
omitted)).

[10] In the present remand redetermination, Commerce explains that, in light of the Diamond
Sawblades proceedings, "the Department has continued to evaluate its practice" regarding the
separate rate test.   Remand Results at 28.

Case 1:15-cv-00044-CRK   Document 171   Filed 01/26/18   Page 13 of 24

Consol. Court No. 15-00044                                                    Page 13
**PUBLIC VERSION**

separate rate, <u>see</u> Oral Argument at 01:14:26–01:14:28, Dec. 8, 2016, ECF No. 120,[11]

the separate rate test is only satisfied upon a respondent rebutting the potential of control

by the minority government shareholder.[12]  <u>Remand Results</u> at 6–7.  Commerce now

argues that the court in <u>An Giang</u> erroneously interpreted Commerce's practice as to the

separate rate test when the court stated that Commerce's "'practice does not require a

respondent to rebut the potential for government control, but rather actual control by the

government entity.'"  <u>Remand Results</u> at 6 (quoting <u>An Giang</u>, 41 CIT at __, 203 F. Supp.

3d at 1289–90).

Commerce's past practice with respect to majority government shareholders

reveals that Commerce views the potential for actual control as actual control, regardless

of whether such control is exercised.[13]  <u>See</u> Steel Wire Rod Decision Memo at 7; Tetra

---

[11] <u>See also</u> Oral Argument at 01:07:26–01:07:37 (Court: "So what's the standard? Is it the potential for control or actual control? And if it is actual control, you really need to connect the dots a little bit more, right?"  Defendant: "It's actual control.")

[12] The minority government shareholder is the [[
                              ]].  CASEAMEX SRA at Ex. 11 (providing a list of CASEAMEX's top ten shareholders at the end of the POR, and identifying the [[                              ]] as one of those shareholders with [[                   ]]).

[13] Tetra Decision Memo and Steel Wire Rod Decision Memo involve government majority shareholders, not government minority shareholders.  <u>See</u> Tetra Decision Memo at 9–10; Steel Wire Rod Decision Memo at 8–9.  In Steel Wire Rod Decision Memo, Commerce determined that four separate rate applicant companies failed to demonstrate de facto independence from the government.  <u>Id.</u> at 8–9.  Three of the companies either had a majority shareholder who was a government entity, or were themselves wholly-owned by a shareholder who was owned by a government entity.  Steel Wire Rod Decision Memo at 8–9.  The fourth company was denied separate rate status based on proprietary information, unavailable to the court.  Steel Wire Rod Decision Memo at 9.  In denying separate rate status, Commerce explained that the sheer level of government ownership meant that the government shareholder was expected to "exercise[] its right inherent in majority ownership[.]"  <u>Id.</u>  Commerce then provided examples of control, such as the appointment of board members and the existence of shared management between the government-owned shareholder company and the respondent company.  <u>Id.</u>

In Tetra Decision Memo, Commerce denied separate rate status to six companies after

Case 1:15-cv-00044-CRK   Document 171   Filed 01/26/18   Page 14 of 24

Consol. Court No. 15-00044                                                    Page 14
**PUBLIC VERSION**

Decision Memo at 8.  Therefore, to the extent that potential control means the ability to

exercise actual control (even without exercising it), Commerce is correct that the standard

in a situation of majority government ownership is potential control.  See Final Results of

Redetermination Pursuant to Remand Order for Diamond Sawblades and Parts Thereof

from      the      [PRC]      at      8–9,      (May      6,      2013),      available      at

https://enforcement.trade.gov/remands/12-147.pdf (last visited Jan. 16, 2018) ("Diamond

Sawblades Remand"); see also Advanced Technology & Materials Co. v. United States,

37 CIT __, 938 F. Supp. 2d 1342 (2013) (sustaining Diamond Sawblades Remand), aff'd,

551 F. App'x 900 (Fed. Cir. 2014).

Nonetheless, the difficulty in labeling Commerce's standard in this case stems from

the term "potential" as it is used in prior proceedings and how it is used here.  Where a

majority shareholder has potential control that control is, for all intents and purposes,

actual control.  In such a situation actual control is inherent in the fact that the majority

---

having "considered the level of government ownership and the role [the majority shareholder(s) played in the selection] of management[.]" Tetra Decision Memo at 8–9. The majority shareholder in each of those six companies was a government-owned entity. Id. at 9–11. Further, and in comparison to Steel Wire Rod Decision Memo, Commerce in Tetra Decision Memo engaged in a more substantial discussion of how the government shareholder's ability to select management manifested in actual participation in the day-to-day operations of the respondent companies. See Tetra Decision Memo at 9–11.

Here, Commerce also relies on its analysis in Stainless Steel Sheet and Strip ("SSSS Decision Memo"), another determination involving a government shareholder who was a majority shareholder. See Remand Results at 6–7, 13; Issues and Decision Memorandum for the Final Determination in the [ADD] Investigation of Stainless Steel Sheet and Strip from the [PRC], A-570-042 (Feb. 1, 2017), available at http://ia.ita.doc.gov/frn/summary/prc/2017-02576-1.pdf (last visited Jan. 16, 2018). In SSSS Decision Memo, Commerce specifically states that, "[f]ollowing the CIT's reasoning in [Advanced Technology & Materials Co. v. United States, 938 F. Supp. 2d 1342 (2013)], it is the Department's practice that majority government ownership means that a government 'exercises, or has the potential to exercise, control over the company's operations generally.'" SSSS Decision Memo at 10 (citations omitted). Once again, Commerce in SSSS Decision Memo denied separate rate status to a company whose majority shareholder was a government entity, where the record evidence demonstrated a lack of independence in selection of management. Id. at 27–31.

Case 1:15-cv-00044-CRK   Document 171   Filed 01/26/18   Page 15 of 24

Consol. Court No. 15-00044                                                    Page 15
**PUBLIC VERSION**

shareholder can typically control the operations of a company without actually removing directors or management since it is clear that directors or management could be removed. See Advanced Technology & Materials Co. v. United States, 37 CIT __, __, 938 F. Supp. 2d 1342, 1348 (2013), aff'd, 551 F. App'x 900 (Fed. Cir. 2014); see also Jiasheng Photovoltaic Tech. Co. v. United States, 39 CIT __, __, 121 F. Supp. 3d 1263, 1266 (2015).   However, the phrase "potential control" suggests something less than actual control and, when used in a case such as here where the government is only a minority shareholder, the phrase "potential control" could be taken to mean something less than the ability to actually direct management.   Commerce's practice has been to find that government minority ownership alone does not preclude the ability to rebut the presumption of control, whether that control be termed "actual" or "potential."  See, e.g., 53-Foot Domestic Dry Containers from the [PRC]: Issues and Decision Memorandum for the Final Determination of Sales at Less Than Fair Value at 48–53, A-570-014, (Apr. 10, 2015),  available at  https://enforcement.trade.gov/frn/summary/prc/2015-08903-1.pdf (last visited Jan. 16, 2018) ("Containers Decision Memo"); Truck and Bus Tires from the [PRC]: Issues and Decision Memorandum for the Final Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances at 10, A-570-040, (Jan. 19, 2017),  available at  https://enforcement.trade.gov/frn/summary/prc/2017-01861-1.pdf (last visited Jan. 16, 2018) ("Truck & Bus Tires Decision Memo").  Here, Commerce cites to Containers Decision Memo and Truck & Bus Tires Decision Memo as examples of prior determinations where the separate rate test was applied to a government shareholder with minority ownership.  Remand Results at 5 (citing Containers Decision Memo at 43–53; Truck & Bus Tires Decision Memo at 8–10).  However, in both determinations,

Case 1:15-cv-00044-CRK   Document 171   Filed 01/26/18   Page 16 of 24

Consol. Court No. 15-00044                                              Page 16
**PUBLIC VERSION**

Commerce relies on more than the presence of government-owned minority shareholders, and cites to record evidence demonstrating how the minority shareholders may exert actual control over the respondent company.  See Containers Decision Memo at 49–50; Truck & Bus Tires Decision Memo at 10.

Indeed, Commerce has required additional indicia of control prior to concluding that a respondent company could not rebut the presumption of de facto government control where the government owns, either directly or indirectly, only a minority of shares in the respondent company.  In Containers Decision Memo, Commerce determined that China Merchants Group ("CMG") and COSCO, shareholders in the respondent company, were able to exercise de facto control despite being minority shareholders with 48.26 percent of the capital shares.  Containers Decision Memo at 48–53.  Commerce found that the two minority shareholders were each wholly-owned by the government and that the total number of shares between the two shareholders made the government a "controlling shareholder," per the respondent company's Articles of Association.[14]  Id. at 48.

In Truck & Bus Tires Decision Memo, Commerce likewise found de facto control by the government-owned minority shareholders.  Truck & Bus Tires Decision Memo at 9–10.  Commerce determined that four of the respondent company's shareholders were owned by a State-owned Assets Supervision and Administration Commission ("SASAC"),

---

[14] In Containers Decision Memo, Commerce provided its rationale for combining the shares of two minority shareholders, despite the companies operating as two separate legal entities. Containers Decision Memo at 51.  Commerce supported its decision to view the two minority shareholders as a block by citing to record evidence.  Id.  Specifically, evidence demonstrating that the two government-owned minority shareholders shared board members, and that their voting records exhibited "a unified approach to governance of [the respondent company]."  Id. (citation omitted).

and together held 49.06 percent of the respondent company's total shares.  Id. at 9.  In reaching that determination, Commerce found it relevant that "there [was] additional information on the record which is business proprietary that further supports our determination that [the respondent company] is under the PRC government control through its [state-owned enterprise] owners."  Truck & Bus Tires Decision Memo at 10. Commerce did not refer to the potential for control, and in fact, only addressed potential control in the context of a majority government shareholder.  See id. at 11–13, 20–24.[15] Therefore, because of this prior practice of requiring more indicia of control in minority situations, Commerce cannot focus solely on potentiality here, without more.  Without more, "potential control" suggests the potential to influence management rather than the potential to actually control management.

In An Giang, the court remanded for further explanation or reconsideration Commerce's determination that CASEAMEX failed to demonstrate autonomy in its selection of management.  Specifically, the court stated that it was

> unclear whether Commerce relied upon the potential for the government to nominate an individual to CASEAMEX's board or to management based on its ownership in the company alone, or whether Commerce found that the government indirectly nominated all of its board members and managers by nominating a representative who appointed [[            ]] board members and managers.

---

[15] In Truck & Bus Tires Decision Memo, Commerce also reviewed whether Double Coin, another separate rate applicant, was de facto independent from the government of the PRC.  Truck & Bus Tires Decision Memo at 11–13; 20–24.  One of Double Coin's shareholders owned 72.15 percent of Double Coin's total shares.  Id. at 12.  This majority shareholder, in turn, was 100 percent controlled by a SASAC.  Id.  Commerce uses potential for control to explain that, in the case of a majority owner, Commerce "presume[s] that Double Coin's managers are 'beholden to the board that controls their pay, in particular to the chairman of the board as the de facto company head under the PRC model,' until proven otherwise."  Id. at 24 (citation omitted).

Case 1:15-cv-00044-CRK   Document 171   Filed 01/26/18   Page 18 of 24

Consol. Court No. 15-00044                                                    Page 18
**PUBLIC VERSION**

An Giang, 41 CIT at __, 203 F. Supp. 3d at 1291 (footnote omitted).  The court indicated that, if Commerce rendered a determination solely on the basis for potential for control by a minority shareholder, Commerce should explain the reasonableness of such a deviation from its past practice of looking for actual control.  Id., 41 CIT at __, 203 F. Supp. 3d at 1292 (citing Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 42 (1983)); see also id., 41 CIT at __, 203 F. Supp. 3d at 1289–90 (providing the An Giang court's discussion of Commerce's practice).  The court also indicated that, if Commerce found that the minority government shareholder indirectly appointed board members, and stifled other shareholders' opportunity to put up competing nominations through Mr. X, Commerce must either reconsider or further explain what record evidence supports such a finding.  Id., 41 CIT at __, 203 F. Supp. 3d at 1292–94.

On remand, Commerce explains that its denial of separate rate status to CASEAMEX was not based on a finding of "actual influence over the selection of managers" by the minority government shareholder during the POR.[16]  Remand Results at 13.  Instead, Commerce determined that "the _ability_ to exert control existed," id. (emphasis in original), due to its finding that Mr. X, who was appointed to the Board of Directors and as General Director of CASEAMEX in 2006, remains beholden to the minority government shareholder, and "exercises control over his employees . . . [who are beholden to him] because Mr. [X] controls the pay of company employees and has the power to hire and fire them[.]"  See id. at 13–14.  Commerce's beholden theory has

---

[16] Commerce's declaration that it did not find that the government minority shareholder exerted actual influence is somewhat contradicted by other statements in the Remand Results where Commerce asserts that "it is reasonable to infer that the [[                    ]] exerted influence over the appointment of the Board of Directors and managers of the company, whether it be directly or indirectly."  Remand Results at 11–12.

Case 1:15-cv-00044-CRK   Document 171   Filed 01/26/18   Page 19 of 24

Consol. Court No. 15-00044                                                    Page 19
**PUBLIC VERSION**

two components: one retrospective (i.e., the government hired Mr. X), see id. at 7–12,

and the other prospective (i.e., the government could fire Mr. X). See id. at 12–16.  The

court does not find Commerce's reliance on retrospective evidence of actions taken by

the minority government shareholder at the formation of CASEAMEX persuasive.

        Commerce's retrospective argument is based on the minority government

shareholder's actions when it divested Can Tho Agriculture and Animal Products Import-

Export Company, a state-owned enterprise, to create CASEAMEX.  Remand Results at

8–11.  Commerce argues that at the time of divestment, the minority government

shareholder put in place the board of directors that continued to exist throughout the POR,

and chose Mr. X as the person through whom it would exert indirect control.  Id.  For the

period of time where CASEAMEX is able to point to record evidence of restrictions placed

upon the minority government shareholder, Commerce does not explain how these

appointments nonetheless support the potential to actually control during the POR.   In

fact, Commerce affirmatively states that it is not relying on the fact that the minority

government shareholder picked board members.   Id. at 13.   Commerce's beholden

theory, as far as it relates to events surrounding the inception of CASEAMEX, is not

reasonable.  These events occurred prior to the POR and do not demonstrate how the

minority government shareholder was able to influence Mr. X's decision-making as to the

day-to-day operations of CASEAMEX or the selection of CASEAMEX's management

during the POR.  Simply put, even assuming that the minority government shareholder

selected all of CASEAMEX's board members, as well as Mr. X, prior to the POR, the

relevant question is whether for the period of time where CASEAMEX is able to point to

Case 1:15-cv-00044-CRK Document 171 Filed 01/26/18 Page 20 of 24

Consol. Court No. 15-00044                                              Page 20
**PUBLIC VERSION**

record evidence of restrictions placed upon the minority government shareholder, did the

minority government shareholder nonetheless retain control over management.[17]

The prospective component of Commerce's beholden theory in this review is

reasonable.   Commerce claims that Mr. X was beholden to the government minority

shareholder for his employment during the POR and therefore it is reasonable to infer

that the government minority shareholder "exerted influence over the appointment of the

Board of Directors and managers of the company."   Remand Results at 11–12, 42.  As

explained above, respondent companies within NME countries are presumed to be under

government control.  Policy Bulletin 05.1 at 1.  A respondent may rebut this presumption,

unless record evidence demonstrates that the majority shareholder is controlled by the

government.   Jiasheng, 39 CIT at __, 121 F. Supp. 3d at 1266 (reiterating Commerce's

revised practice as to precluding companies that have majority government shareholders

from rebutting the presumption of de facto control); see also Tetra Decision Memo at 8;

Steel Wire Rod Decision Memo at 6–7 (explaining Commerce's practice).  The burden of

rebutting the presumption of control is on the respondent company; here, that is

CASEAMEX.    To rebut the presumption of control, CASEAMEX relies upon the

---

[17] Defendant argues that Commerce's retrospective view is necessary to take into account the totality of factual circumstances supporting the potential control the [[                    ]] retains over CASEAMEX.  Def.'s Resp. to Pls.' Comments on Remand Redetermination at 21–23, Nov. 24, 2017, ECF No. 158.  Defendant argues that past factual circumstances, such as employment history and events surrounding the creation of CASEAMEX's first board of directors, inform the reasonable inferences Commerce is making.  Id.  The court notes that, in Containers Decision Memo, Commerce referenced the fact that a majority of the board of directors and supervisory committee members were employed by the government minority shareholders in the past.  Containers Decision Memo at 50.  Nevertheless, it is not clear to the court how past employment would support Commerce's beholden theory here.  If Commerce is suggesting that past employees may feel grateful to their past employers, Commerce should explain why that gratitude translates into a lack of independence in a case where the past government employer no longer has the power to dismiss the employee.

Case 1:15-cv-00044-CRK   Document 171   Filed 01/26/18   Page 21 of 24

Consol. Court No. 15-00044                                                    Page 21
**PUBLIC VERSION**

restrictions placed upon the minority government shareholder in CASEAMEX's 2012 Articles of Association. See CASEAMEX Comments on Final Remand Redetermination at 18–20, Aug. 30, 2017, ECF No. 140 ("CASEAMEX Resp. Comments"); see also CASEAMEX SRA at Ex. 10 at Art. 21 ¶1 (reproducing the provision of CASEAMEX's Articles of Association requiring that a member of the Board of Directors is approved by a 65 percent shareholder approval vote).[18]

On remand, Commerce relies on the fact that, prior to the adoption of the 2012 Articles of Association, the minority government shareholder could exercise its rights to control Mr. X. See Remand Results at 11–12. CASEAMEX asserts that the 2012 Articles of Association restrict the control of the minority government shareholder. See CASEAMEX Resp. Comments at 22 (asserting that CASEAMEX's Articles of Association were in effect throughout the entirety of the POR); id. at 21–23 (asserting that CASEAMEX demonstrated that the selection of managers and directors were restrained by the provisions in CASEAMEX's Articles of Association). However, the Articles of Association placed on the record are dated October 2012, were issued under the signature and seal of Mr. X, and "supersede[d] the previous Articles of Association issued in 2006." See CASEAMEX SRA at Ex. 10 at Preface. Therefore, the 2012 Articles of Association only relate to a portion of the POR. For a period of approximately 61 days at

---

[18] CASEAMEX's Articles of Association refer to both a "Board of Management" and a "Board of Directors." See CASEAMEX SRA at Ex. 10. However, a review of the Articles of Association demonstrates that these two terms in fact refer to the same entity. For example, although the Table of Contents indicates that section VII of CASEAMEX's Articles of Association encompasses the articles related to the "Board of Directors," see id. at Ex. 10 at Table of Contents, section VII is in fact entitled "Board of Management" and its individual articles address the composition, rights, and responsibilities of the "Board of Management." See id. at Ex. 10 at Arts. 25–28. To avoid confusion, the court refers to this entity as the "Board of Directors" throughout this opinion.

Case 1:15-cv-00044-CRK   Document 171   Filed 01/26/18   Page 22 of 24

Consol. Court No. 15-00044                                                    Page 22
**PUBLIC VERSION**

the beginning of the POR, the 2006 Articles of Association were in effect.  The parties do not direct the court to where on the record a copy of CASEAMEX's 2006 Articles of Association has been reproduced.  The parties do not agree whether the 2006 and 2012 Articles of Association are substantively the same.[19]  Compare Remand Results at 12–13 with CASEAMEX Resp. Comments at 17, 22.  Therefore, the court cannot presume that the 2006 Articles of Association restrict the minority government shareholder in any way.

As a result, Commerce's view that CASEAMEX has failed to rebut the presumption of de facto government control because during the POR Mr. X was beholden to the minority government shareholder, and the employees of CASEAMEX were beholden to Mr. X for their employment, Remand Results at 13–14, is reasonable.[20]  Without knowing the contents of CASEAMEX's 2006 Articles of Association, the court cannot say that it is unreasonable for Commerce to presume that the minority government shareholder would

---

[19] Commerce identifies the 2012 Articles of Association as establishing minority shareholder rights and infers that prior to that time "[the [[                    ]]] exercised its right as the largest shareholder in selecting the Board of Directors and management of CASEAMEX." See Remand Results at 12–13.  CASEAMEX, on the other hand, presumes that the 2012 Articles of Association were in effect throughout the entirety of the POR, see CASEAMEX Resp. Comments at 22, and that the Articles of Association operating in 2006 were substantively the same. Id. at 17 (arguing, without being specific as to the year of the operative version of the Articles of Association relied upon, that the board of directors in 2006 "could only be selected via the rules outlined in the company's Articles of Association").

[20] Commerce also argues that Mr. X's dual role as General Director and Chairman of the Board of Directors allows him control over the CASEAMEX employees and the CASEAMEX managers. See Remand Results at 39–40; see also id. at 13–14.  According to CASEAMEX's Articles of Association, by virtue of holding both positions, Mr. X holds significant power over the employees of CASEAMEX.  See CASEAMEX SRA at Ex. 10 at Sec. VII–VIII.  In light of Mr. X's rights and responsibilities, it is reasonably discernable that Commerce determined that Mr. X is able to exert control over CASEAMEX employees, who own a combined share of [[            ]] of CASEAMEX shares.  Remand Results at 13–14; Can Tho Import-Export Joint Stock Company (CASEAMEX) Third Sep. Rate Supp. Questionnaire at Ex. S3-7, CD 149–CD 150, bar codes 3207617-01–02 (June 6, 2014).

have been able to direct and control Mr. X[21] and, through him, control the CASEAMEX

employees.  It may be that the 2006 Articles of Association are similar to the 2012 Articles

of Association.   However, it may also be that the 2006 Articles of Association had

provisions similar to those in Containers.  See Containers Decision Memo at 46–47

(reproducing, in relevant part, the Articles of Association of the respondent company in

Containers Decision Memo, which include a provision allowing for a minority shareholder,

acting alone or with others, to be a "controlling shareholder," while holding a minority of

shares).  The 2006 Articles of Association are not on the record and it is not unreasonable

for Commerce to have assumed that they were not identical to the 2012 Articles.

Therefore, for this review, it is not clear that CASEAMEX sufficiently showed that the

minority government shareholder was restrained by CASEAMEX's 2012 Articles of

Association.  It is CASEAMEX's burden to populate the record with evidence rebutting

the existence of de facto government control.  See Sigma Corp v. United States, 117 F.3d

1401, 1405–06 (Fed. Cir. 1997).   Here, CASEAMEX has not demonstrated how the

protective rights available in the 2012 Articles of Association could have been exerted

during the first 61 days of the POR, when the 2006 Articles of Association remained in

---

[21] Commerce also argues that at CASEAMEX's inception, the [[                    ]] was able
to play an "important role" in selection of managers and board members, because the Articles of
Association were not in place to serve as a restraint.  Remand Results at 10 (arguing that because
at CASEAMEX's inception  the [[                    ]] was the largest shareholder and the
Articles of Association were not adopted until 2012, the [[                    ]] was able to play
an "important role" in the selection of managers and members of CASEAMEX's first board of
directors, of which [Mr. X] was a member); see id. at 11 (arguing that it is reasonable to infer that
"because the Articles of Association granting minority shareholder rights had not yet been adopted
. . . [the [[                    ]]] exercised its right as the largest shareholder in selecting the
Board of Directors and management of CASEAMEX.").

**PUBLIC VERSION**

effect.  As a result, Commerce's determination that there existed the potential for actual control by the minority government shareholder during the POR was reasonable.

## CONCLUSION

In accordance with the foregoing, the <u>Remand Results</u> comply with the court's order in <u>An Giang</u>, 41 CIT at __, 203 F. Supp. 3d at 1294–95, and are therefore sustained. Judgment will enter accordingly.

 /s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated: January 19, 2018
          New York, New York